**James R. PETERSON et al., Plaintiffs,**

v.

**Jack DAVIS et al., Defendants.**

**Civ. A. No. 76–0116–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Sept. 28, 1976.

---

J. Barrett Jones, Jr., Neighborhood Legal Aid Society, Richmond, Va., for plaintiffs.

Patrick A. O'Hare, Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, inmates of the Virginia penal system, bring this action under 42 U.S.C. § 1983 to redress alleged unconstitutional treatment during the course of their incarceration in certain of Virginia penal institutions. Specifically, the plaintiffs contend they were denied due process of law in transferring and reclassification proceedings and that they are unconstitutionally denied access to legal materials while confined in "M" Building at the Powhatan Correctional Center and "C" Building at the Virginia State Penitentiary. Defendants include several Virginia correctional officials. Jurisdiction is attained pursuant to 28 U.S.C. § 1343(3). The Court having taken evidence on the issues makes the following findings of fact and conclusions of law.

1. Prior to Sunday, February 15, 1976, plaintiff James R. Peterson (hereinafter referred to as "Peterson") was incarcerated as a state prisoner in the Virginia State Penitentiary, Richmond, Virginia. He had a "C" security classification, and received all the privileges generally accorded inmates in that custody. He had not been charged with or found guilty of any violations or institutional rules since his re-entry into the penal system in August, 1975.

2. On February 15, 1976, Peterson, then a prisoner at the Virginia State Penitentiary, was transferred to the Powhatan Correctional Center. The transfer was initiated by Robert Zahradnick who had assumed the duties as Warden just a few days previous thereto. The Warden had received information from members of his staff that plaintiff Peterson had violated divisional guidelines in his capacity as chairman of the Inmate Advisory Committee and that Peterson was then planning to release information to the general inmate population which, in the view of the staff and of the Warden, could cause unrest among the population. The Warden's motivation for transferring Peterson was solely a concern for institutional security during a time of transition of authority. The evidence discloses that the transfer was in no way designed to curtail Peterson's exercise of constitutionally protected rights.

3. Within two weeks of his transfer to Powhatan, Peterson was again transferred, this time to the James River Correctional Center. Prior thereto, officials at Powhatan were in receipt of information to the effect that an inmate sit-down strike was imminent. Information received on February 26, 1976 indicated that the planned strike would take place on the morning of February 27th. Coincidently, a ground breaking ceremony for a new receiving unit at Powhatan was scheduled for that morning. Several local officials, corrections officials, and news media were to attend the ceremony. Inmate informants disclosed to certain of the Powhatan officials that the leaders of the strike were inmates Morris Jefferson, Larry Smith and Peterson. On the basis of this information, defendants Mitchell and Muncy caused Peterson, Smith and Jefferson to be transferred to the James River Correctional Center during the early morning of February 27th. The evidence discloses that a few hours thereafter, a nonviolent sit-down strike did occur involving approximately 100 inmates.

4. The Powhatan officials based the transfer decision on a good faith belief that the plaintiffs presented a threat to the se-

curity of the institution. The transfer was not punitive, but merely a protective measure.

5. Later events verified Peterson's and Smith's leadership roles in the sit-down demonstration.

6. Upon his transfer to the James River facility, Peterson was placed in isolation under padlock. Thereafter, on March 2, 1976, the Institutional Classification Committee (ICC) of Powhatan provided Peterson a hearing on the transfer of February 27, 1976. The notice of that hearing received by Peterson indicated that the ICC would review Peterson's custody status on the ground that he was "a threat to the security of the institution by making a speech to a large number of inmates in the recreation area on February 26, 1976."

7. The ICC recommended that Peterson receive a maximum security classification ("M" custody) and assignment to segregation in C Building at the Penitentiary or M Building at the Powhatan Correctional Center. These recommendations were approved by the Central Classification Board (CCB) on March 10, 1976, but subsequently the Board ordered a rehearing of the matter.

8. On March 9, 1976, Peterson was transferred back to "M" Building at Powhatan where he was placed under padlock in a segregation cell. He was removed from padlock approximately one month later, but remained in segregation status.

9. On March 15, 1976, Peterson received two additional ICC hearings. The first occurred in the morning of that day and concerned the February 27th transfer from Powhatan to the James River jail. The second occurred in the afternoon of that date and concerned the February 15th transfer from the Penitentiary to Powhatan. The evidence discloses that Peterson was not permitted to call three requested witnesses nor was he afforded assistance of counsel at any of the ICC hearings pertaining to the transfers and classification. As a result of the ICC hearings held March 15, 1976, Peterson was reclassified to "M" custody, or maximum security status.

10. One in "M" custody is confined to an 8 by 6 foot cell and is permitted to go outside for two or three hours a day for exercise. He receives two warm meals per day and a bag lunch. He is not permitted to attend chapel. He is additionally precluded from participating in rehabilitative or work programs.

11. It is the policy and practice of the defendants not to permit the plaintiffs confined in "M" Building at Powhatan and "C" Building at the Penitentiary to use the respective institutional law libraries. Such plaintiffs may not go to the libraries for any reason and they may not receive any materials from the libraries; because they do not have access to the general inmate population, they may not send other inmates to the libraries to do work on their behalf.

12. The limitations placed on inmates confined to "C" Building at the Penitentiary and "M" Building at Powhatan are premised on security and resource conservation concerns. Inmates placed in maximum security are not permitted access to the law library because to do so would require their comingling with the general inmate population. It is felt that this presents a security risk. Legal materials are not permitted to be checked out in order to minimize the danger of losing the materials and in order to make them available to the general inmate population.

13. Inmates placed in maximum security status at Powhatan or the Penitentiary have four sources of legal assistance: (1) such inmates are free to retain attorneys if they so desire; (2) fellow inmates in "C" or "M" Buildings are permitted to provide assistance; (3) inmates are permitted to keep all legal materials belonging to them in their cell; and (4) all inmates have access to a statutorily created court-appointed assistance program. It is this program upon which the defendants primarily rely in the defense of the instant actions.

14. Section 53–21.2 of the Code of Virginia (1950), as amended, provides for the appointment of attorneys "to counsel and

assist indigent inmates . . . regarding any legal matters relating to their incarceration." In the judicial circuits in which the Penitentiary and Powhatan Correctional Center are located, attorneys have been appointed to assist inmates pursuant to this section. At each institution, inmates' requests for legal assistance are forwarded to one of the court-appointed attorneys. The assistance of these court-appointed attorneys is available to all inmates at each of the institutions.

15. There have been, during the times pertinent to the instant litigation, five attorneys appointed to serve approximately 900 inmates incarcerated in the State Penitentiary. There is one attorney appointed to serve the Powhatan facility which presently houses approximately 800 inmates. Defendant Muncy, Superintendent of the Powhatan Correctional Center, has requested the appointment of additional attorneys but, as of yet, has not been successful in this regard.

16. Attorneys appointed under Virginia Code Ann. Section 53–21.2 are to advise an inmate as to problems pertaining to his incarceration. Particularly, the attorneys are to aid in the preparation of writs of habeas corpus and suits relating to the conditions of confinement. These attorneys are expected to informally present an inmate's grievance relating to conditions of incarceration to prison officials prior to taking any formal adversarial action. Attorneys appointed under the program do not represent individual inmates, but merely advise and assist them.

17. The appointed attorneys may counsel an inmate only with reference to habeas corpus or prison condition matters. He cannot counsel inmates with reference to other civil matters, such as divorces, or internal prison classification or disciplinary proceedings.

18. Due to the demands placed upon the system by inmates and the limited number of participating attorneys, it is not unusual for inmates to wait a reasonable length of time before an attorney is available for consultation. The delays disclosed by the evidence are not in the Court's view excessive.

Premised on the foregoing findings of fact, the Court makes the following conclusions of law:

■ 1. Under Virginia law, a prisoner has no right or expectancy to be assigned to any particular institution. *See* Va. Code Ann. Section 53–19.17 (1974 Repl. Vol.)

■ 2. The transfers of the instant plaintiffs were prompted by the legitimate concerns of the prison officials in maintaining institutional security and were not "made in retribution for [their] exercise of protective rights." *See Montanye v. Haymes,* —— U.S. ——, 96 S.Ct. 2543, 2548, 49 L.Ed.2d 466 (1976) (J. Stevens, dissenting).

3. The due process and liberty interest of the plaintiffs were, therefore, not infringed by the transfers involved herein. *Meachum v. Fano,* —— U.S. ——, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* —— U.S. ——, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976).

■ 4. Although not constitutionally required, Virginia does generally provide inmates with a hearing prior to their transfer. The circumstances surrounding the plaintiffs' transfers constituted a temporary emergency within the meaning of the pertinent prison regulations, and therefore justified the action taken. The post-transfer ICC hearings held conformed with prison regulations.

■ 5. The procedural requirements delineated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) are not applicable to reclassification proceedings of the ICC. *Cooper v. Riddle,* 540 F.2d 731 (4th Cir. 1976).

6. The institutional procedures applicable to ICC reclassifications were adhered to in the instant action.

■ 7. The state has a constitutional obligation to furnish either adequate legal research facilities to the inmates of its correctional system or an acceptable alterna-

tive. *Smith v. Bounds,* 538 F.2d 541 (4th Cir. 1975); *Vetle v. Virginia Department of Corrections,* 529 F.2d 518 (4th Cir. 1976); *Kirby v. Ciccone,* 491 F.2d 1310, 1312 (8th Cir. 1974). In light of the fact that inmates, such as the plaintiffs being confined in "M" or "C" Buildings, do not have access to state provided legal research facilities, the Court is not required to comment upon the adequacy of said facilities.

8. The burden of establishing an acceptable alternative rests with the state when access to legal research facilities is as in the instant case, denied. *Vetle v. Virginia Department of Corrections, supra; Novak v. Beto,* 453 F.2d 661, 664 (5th Cir. 1971).

9. Although the Virginia attorney assistance program would unquestionably benefit from the participation of additional lawyers, the program is basically an acceptable alternative to an adequate legal research facility. While the appointed attorneys do not represent the particular inmates, they are expected to provide counsel and assist in the preparation of pleadings and actions involving prison conditions or attacks on convictions. The Court is satisfied that the assistance of trained lawyers adequately meets the demands for legal services of inmates confined to "M" or "C" Buildings. That delays occur between the time an inmate requests the assistance of an attorney and the time the attorney consults the inmate is regrettable, but can hardly be said to render the system inadequate. The delays in the instant case were not, as the Court has already stated, shown to be excessive. *Cf. Minns v. Paul,* 542 F.2d 899 (4th Cir. 1976). An inmate who does not have access to legal research material and yet must respond promptly to a court's order in a pending action may, if not granted prompt assistance by an attorney, inform the Court pro se. Under such circumstances, it is difficult to conceive that a court would not grant a reasonable continuance. Prison officials testified that the availability of the program was being made known to all inmates. Such efforts are, of course, to be commended.

In short, the Court concludes that the defendants' constitutional obligation to inmates not afforded access to an adequate law library is satisfied by making available the assistance of counsel pursuant to Virginia law.

An appropriate order will issue.