# MEACHUM, CORRECTIONAL SUPERINTEND-ENT, ET AL. *v.* FANO ET AL.

No. 75–252.  Argued April 21, 1976—Decided June 25, 1976

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 229.

*Michael C. Donahue,* Assistant Attorney General of Massachusetts, argued the cause for petitioners. With him on the brief were *Francis X. Bellotti,* Attorney General, and *John J. Irwin, Jr.,* and *David A. Mills,* Assistant Attorneys General.

*Richard Shapiro* argued the cause and filed a brief for respondents.

*Deputy Solicitor General Jones* argued the cause for the United States as *amicus curiae* urging reversal. On the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Jerome M. Feit.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The question here is whether the Due Process Clause of the Fourteenth Amendment entitles a state prisoner to a hearing when he is transferred to a prison the conditions of which are substantially less favorable to the prisoner, absent a state law or practice conditioning such transfers on proof of serious misconduct or the occurrence of other events. We hold that it does not.

I

During a 2½-month period in 1974, there were nine serious fires at the Massachusetts Correctional Institution at Norfolk—a medium-security institution. Based primarily on reports from informants, the six respondent inmates were removed from the general prison population and placed in the Receiving Building, an administrative detention area used to process new inmates. Proceedings were then had before the Norfolk prison

Classification Board with respect to whether respondents were to be transferred to another institution—possibly a maximum-security institution, the living conditions at which are substantially less favorable than those at Norfolk. Each respondent was notified of the classification hearing and was informed that the authorities had information indicating that he had engaged in criminal conduct.[1]

Individual classification hearings were held, each respondent being represented by counsel. Each hearing began by the reading of a prepared statement by the Classification Board. The Board then heard, *in camera* and out of the respondents' presence, the testimony of petitioner Meachum, the Norfolk prison superintendent,

---

[1] Respondents Fano, DeBrosky, and Dussault received the following notice:

"The department has received information through a reliable source that you were in possession of instruments that might be used as weapons and/or ammunition and that you had joined in plans to use these contraband items.

"These items and plans occurred during the period of serious unrest at MCI, Norfolk which included many fires that posed a significant threat to lives of persons at MCI, Norfolk as well as serious property damage."

Respondents Hathaway and McPhearson received the following notice:

"The department has received information through reliable sources that you were significantly involved in the planning and execution of one or more of the serious fires occurring within MCI, Norfolk in the past few weeks. These fires caused considerable property damage and posed a very real threat to personal safety."

Respondent Royce received the following notice:

"The department has received information through a reliable source that you were involved in the trafficking of contraband in MCI, Norfolk (narcotics, barbiturates and/or amphetamines).

"This occurred during a period of serious unrest at MCI, Norfolk which included many fires, that posed a significant threat to the lives of persons at MCI, Norfolk as well as serious property damage."

who repeated the information that had been received from informants. Each respondent was then told that the evidence supported the allegations contained in the notice but was not then—or ever—given transcripts or summaries of Meachum's testimony before the Board. Each respondent was allowed to present evidence in his own behalf; and each denied involvement in the particular infraction being investigated. Some respondents submitted supportive testimony or written statements from correction officers. A social worker also testified in the presence of each respondent, furnishing the respondent's criminal and custodial record, including prior rule infractions, if any, and other aspects of his performance and "general adjustment" at Norfolk.

The Board recommended that Royce be placed in administrative segregation for 30 days; that Fano, Dussault, and McPhearson be transferred to Walpole, a maximum-security institution where the living conditions are substantially less favorable to the prisoners than those at Norfolk, and that DeBrosky and Hathaway be transferred to Bridgewater which has both maximum- and medium-security facilities. The reasons for its actions were stated in the Board's reports,[2] which, however,

---

[2] With respect to Dussault, the Board recorded:

"*Reasons for decision:*

"1. The 'reliable sources' were deemed acceptable as reliable because they had produced truthful and verifiable information prior to incidents, which were then avoided and serious harm prevented.

"2. Mr. Dussault has not made significant use of program facilities at MCI Norfolk. He has, in effect only been doing time.

"*To Mr. Dussault & Attorney:*

"There is sufficient & significant information that has been made available to the committee that indicates to us that you have placed yourself in a situation at MCI Norfolk so that adequate programming cannot be provided at this time."

were not then available to respondents. Although respondents were aware of the general import of the informants' allegations and were told that the recommen-

---

The Board's statement of reasons for its decision with respect to Fano was:

"1. The inclosed summary of informant information was considered. The sources are considered quite reliable in this case and tend to corroborate each other. In addition, the number of times the subject was named in conjunction with the unrest at Norfolk adds weight in the judgment of this board to the reliability of this information.

"2. The seriousness of his involvements were considered extreme. The danger posed by weapons and materials used for violence weighs very heavily against remaining in this population. In addition, the type of involvement of this man as an organizer, leader and [e]nforcer was considered detrimental to the institution, and prohibitive to rehabilitative programming at MCI Norfolk at this time."

Similarly, with respect to McPhearson:

*"Basis for Recommendation:*

"1. Informant Information was judged sufficient in detail and reliability to be weighed seriously in the board[']s decision making. The information regarding the subject's attitude and motivation seemed adequately supported by the man's record and his attitude before the board. (He stated he had never received fair treatment at classification.) The reliability of the information was judged as quite reliable in that it came from three sources. When asked, Mr. Meachum provided details of the course of events on the night of Oct. 13th which substantiated in general terms the informant information presented (see attached letter).

"2. The sources themselves were considered reliable, especially in cases of sources C and D. (See attached statement concerning reliability of sources.)"

With respect to Hathaway, the Board stated:

*"Basis for Decision:*

"1. When Mr. Hathaway was questioned during interview re: the charges expressed on notice of Classification hearing 'serious fires occurring with MCI Norfolk . . . ,' he immediately went into long discussion of two specific fires denying his [guilt]—Although he was not privy to informant information, and could not have known

dations drew upon informant sources, the details of this information were not revealed to respondents and are not included in the Board's reports which are part of the record before us.

specifics that these were the two mentioned in the charges. The more he talked, the more he appeared involved.

"2. The 'reliable sources' were deemed acceptable as reliable because they had produced truthful information prior to incidents that were then avoided and serious harm prevented.

"3. Mr. Hathaway, other than avocation has not made sufficiently of available programs at MCI Norfolk that might benefit him.

*"Decision as Presented to Mr. Hathaway:*

"This committee feels that you should be removed from this environment and associates and the current situation at MCI Norfolk. Because of this, the recommendation will be to MCI Bridgewater. There are programs, such as AA which will be available to you. There is also a new avocational center in which you can become active. It is a Medium Security institution, and this committee has tried to listen when you've said 'Trust me'—Give me a chance. . . .'

"Mr. Stolzberger requested that his client be allowed to return to population to empty room and sell Avo equipment. Denied.

"A counter suggestion was made that he work with Mr. Jackson, social worker to accomplish these ends. Mr. Hathaway accepted."

The explanation as to Royce was:

*"Basis for Recommendation:*

"1. Informant information was presented by Mr. Larry Meachum, Supt of MCI Norfolk, prior to the hearing. Although several sources contributed to the presenting information, the committee felt that the sources had not been proved reliable enough to become a decisive factor, indicating transfer. Both Mr. Meachum's report & Source reliability report to follow elsewhere in this report.

"2. Although Mr. Royce had an additional disciplinary report (see D reports 2–3). It was felt by the committee to be of serious emotional instability rather than resorting to earlier behavior of absolute violence.

"3. Mr. Royce appears to be making an effort to get himself together with help. His good relationship with Mrs. Lowenstein and Mr. Jackson has been supportive of these efforts. His indi-

The Board's recommendations were reviewed by the Acting Deputy Commissioner for Classification and Treatment and by the Commissioner of Corrections on the basis of the written report prepared by the Board. They accepted the recommendations of the Board with respect to Fano, Dussault, Hathaway, and McPhearson. DeBrosky and Royce were ordered transferred to Walpole.[3] The transfers were carried out, with two exceptions.[4] No respondent was subjected to disciplinary

---

cated interest in poetry, avocation, and school would also reaffirm his intent for self improvement."

As to DeBrosky, the record shows only:

"*Basis for Recommendation:*

"Summary of Informant Information and Conclusions:

"*Informant Information Excised.*"

[3] The Commissioner's action was reported to DeBrosky's attorney as follows:

"As you are aware, the recommendation of the Board was for placement at MCI-Bridgewater. However, after a thorough review of the facts, with considerable concern being given to the intelligence information that connected Mr. DeBrosky with involvement with a weapon, the Commissioner has decided to place Mr. DeBrosky at MCI-Walpole. The intelligence information referred to above was judged to be reliable. Your request that the subject be placed back into the population at MCI-Norfolk is being denied."

The Commissioner also explained his action with respect to Royce:

"Upon careful examination of all related materials and information, I have reached the following decision:

"Placement: MCI, Walpole.

"Reasons: I disagree with the recommendation of the Board and I am assigning you to MCI, Walpole because I feel that you have demonstrated that you are unwilling and/or unable to accept the responsibility that is commensurate with assignment to MCI, Norfolk, a medium security facility. Your actions of Nov. 1, 1974 whereby you destroyed state property and displayed disrespect to a Correctional Officer have played a part in this decision."

[4] At the time of the District Court hearing, DeBrosky was hospitalized at Norfolk, and Hathaway had not yet been transferred.

punishment upon arrival at the transfer prison. None of the transfers ordered entailed loss of good time or disciplinary confinement.[5]

Meanwhile respondents had brought this action under 42 U. S. C. § 1983 against petitioners Meachum, the prison superintendent; Hall, the State Commissioner of Corrections; and Dawber, the Acting Deputy for Classification and Treatment, alleging that respondents were being deprived of liberty without due process of law in that petitioners had ordered them transferred to a less favorable institution without an adequate factfinding hearing. They sought an injunction setting aside the ordered transfer, declaratory relief, and damages.

The District Court understood *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), to entitle respondents to notice and hearing and held both constitutionally inadequate in this case. Respondents were ordered returned to the general prison population at Norfolk until transferred after proper notice and hearing. Petitioners were also ordered to promulgate regulations to establish procedures governing future transfer hearings involving informant testimony. A divided panel of the Court of Appeals affirmed, 520 F. 2d 374, holding that the transfers from Norfolk to maximum-security institutions involved "a significant modification of the overall conditions of confinement" and that this change in circumstances was "serious enough to trigger the application of due process protections." *Id.,* at 377–378.[6]

---

[5] In addition to notice of the classification hearing, each respondent had been furnished with a copy of a disciplinary report specifying the instances of alleged misconduct. Under the applicable regulation, however, disciplinary proceedings were not held because the alleged misconduct had been referred to the local district attorney for investigation and action.

[6] The Court of Appeals did not distinguish between disciplinary and administrative transfers:

"We attach no significance for present purposes to the fact that

We granted the prison officials' petition for writ of certiorari, 423 U. S. 1013 (1975), in order to determine whether the Constitution required petitioners to conduct a factfinding hearing in connection with the transfers in this case where state law does not condition the authority to transfer on the occurrence of specific acts of misconduct or other events and, if so, whether the hearings granted in this case were adequate. In light of our resolution of the first issue, we do not reach the second.

## II

The Fourteenth Amendment prohibits any State from depriving a person of life, liberty, or property without due process of law. The initial inquiry is whether the transfer of respondents from Norfolk to Walpole and Bridgewater infringed or implicated a "liberty" interest

---

these proceedings were for 'classification' rather than 'discipline.' Defendants assert that 'there are in the instant case as many administrative overtones as disciplinary ones,' but we have already indicated that in our view the motive of prison officials, as such, is not properly a part of the due process calculus. *Gomes* v. *Travisono,* 510 F. 2d 537, 541 (1st Cir. 1974). Whether the transfer is thought of as punishment or as a way of preserving institutional order, the effects on the inmate are the same and the appropriateness of the action depends upon the accuracy of the official allegation of misconduct." 520 F. 2d, at 376 n. 2.

See also *Gomes* v. *Travisono,* 510 F. 2d 537 (CA1 1974), modifying and affirming 490 F. 2d 1209 (1973).

Other Courts of Appeals, including the Court of Appeals for the Second Circuit, see *Montanye* v. *Haymes, post,* p. 236, have held that minimum procedures must accompany only disciplinary transfers. *Aikens* v. *Lash,* 514 F. 2d 55 (CA7 1975); *Carroll* v. *Sielaff,* 514 F. 2d 415 (CA7 1975); *Ault* v. *Holmes,* 506 F. 2d 288 (CA6 1974); *Stone* v. *Egeler,* 506 F. 2d 287 (CA6 1974). See also *Bryant* v. *Hardy,* 488 F. 2d 72 (CA4 1973). Still others have indicated that transfers of inmates do not call for due process hearings. *Gray* v. *Creamer,* 465 F. 2d 179, 187 (CA3 1972); *Hillen* v. *Director,* 455 F. 2d 510 (CA9 1972); cf. *Fajeriak* v. *McGinnis,* 493 F. 2d 468 (CA9 1974).

of respondents within the meaning of the Due Process Clause. Contrary to the Court of Appeals, we hold that it did not. We reject at the outset the notion that *any* grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. In *Board of Regents* v. *Roth,* 408 U. S. 564 (1972), a university professor was deprived of his job, a loss which was surely a matter of great substance, but because the professor had no property interest in his position, due process procedures were not required in connection with his dismissal. We there held that the determining factor is the nature of the interest involved rather than its weight. *Id.,* at 570–571.

Similarly, we cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison if, as is likely, the State has more than one correctional institution. The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.

Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

Our cases hold that the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect. See *Wolff* v. *McDonnell,* 418 U. S., at 556, and cases there cited. But none of these cases reaches this one; and to hold as we are urged to do that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts.

Transfers between institutions, for example, are made for a variety of reasons and often involve no more than informed predictions as to what would best serve institutional security or the safety and welfare of the inmate. Yet under the approach urged here, any transfer, for whatever reason, would require a hearing as long as it could be said that the transfer would place the prisoner in substantially more burdensome conditions that he had been experiencing. We are unwilling to go so far.

*Wolff* v. *McDonnell,* on which the Court of Appeals heavily relied, is not to the contrary. Under that case, the Due Process Clause entitles a state prisoner to cer-

tain procedural protections when he is deprived of good-time credits because of serious misconduct. But the liberty interest there identified did not originate in the Constitution, which "itself does not guarantee good-time credit for satisfactory behavior while in prison." *Id.,* at 557. The State itself, not the Constitution, had "not only provided a statutory right to good time but also specifies that it is to be forfeited only for serious mis-behavior." *Ibid.* We concluded:

> "[A] person's liberty is equally protected, even when the liberty itself is a statutory creation of the State. The touchstone of due process is protection of the individual against arbitrary action of government, *Dent* v. *West Virginia,* 129 U. S. 114, 123 (1889). Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Id.,* at 558.

The liberty interest protected in *Wolff* had its roots in state law, and the minimum procedures appropriate under the circumstances were held required by the Due Process Clause "to insure that the state-created right is not arbitrarily abrogated." *Id.,* at 557. This is consistent with our approach in other due process cases such as *Goss* v. *Lopez,* 419 U. S. 565 (1975); *Board of Regents* v. *Roth, supra; Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Goldberg* v. *Kelly,* 397 U. S. 254 (1970).

Here, Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct. Insofar as we are advised, transfers between Massachusetts prisons are not conditioned upon

the occurrence of specified events.[7] On the contrary, transfer in a wide variety of circumstances is vested in prison officials. The predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff* v. *McDonnell* is totally nonexistent in this case.

---

[7] At the time the transfers in this case occurred, Massachusetts General Laws Annotated, c. 127, §§ 20 and 97 (1974) provided as follows:

"§ 20. Classification of prisoners; approval

"There shall be established by the commissioner, with the approval of the governor and council, a reception center for all male prisoners, except those sentenced to the Massachusetts Correctional Institution, Bridgewater. Any male convict who is sentenced to any correctional institution of the commonwealth, except the Massachusetts Correctional Institution, Bridgewater, shall be delivered by the sheriff or other officer authorized to execute sentence to said center for the purpose of proper classification of the prisoner. Classification of female prisoners shall be made at the Massachusetts Correctional Institution, Framingham, under the supervision of the deputy commissioner for classification and treatment.

"The deputy commissioner for classification and treatment, under the general supervision of the commissioner, shall direct the professional staff assigned to said reception center, and shall be responsible for grading and classifying all prisoners sentenced to any of the correctional institutions of the commonwealth, and shall in addition have general charge of the reception center."

"§ 97. Transfers from and to correctional institutions; approval

"The commissioner may transfer any sentenced prisoner from one correctional institution of the commonwealth to another, and with the approval of the sheriff of the county from any such institution except a prisoner serving a life sentence to any jail or house of correction, or a sentenced prisoner from any jail or house of correction to any such institution except the state prison, or from any jail or house of correction to any other jail or house of correction. Prisoners so removed shall be subject to the terms of their original sentences and to the provisions of law governing parole from the correctional institutions of the commonwealth."

Even if Massachusetts has not represented that transfers will occur only on the occurrence of certain events, it is argued that charges of serious misbehavior, as in this case, often initiate and heavily influence the transfer decision and that because allegations of misconduct may be erroneous, hearings should be held before transfer to a more confining institution is to be suffered by the prisoner. That an inmate's conduct, in general or in specific instances, may often be a major factor in the decision of prison officials to transfer him is to be expected unless it be assumed that transfers are mindless events. A prisoner's past and anticipated future behavior will very likely be taken into account in selecting a prison in which he will be initially incarcerated or to which he will be transferred to best serve the State's penological goals.

A prisoner's behavior may precipitate a transfer; and absent such behavior, perhaps transfer would not take place at all. But, as we have said, Massachusetts prison officials have the discretion to transfer prisoners for any number of reasons. Their discretion is not limited to instances of serious misconduct. As we understand it no legal interest or right of these respondents under Massachusetts law would have been violated by their transfer whether or not their misconduct had been proved in accordance with procedures that might be required by the Due Process Clause in other circumstances. Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all.

Holding that arrangements like this are within reach of the procedural protections of the Due Process Clause would place the Clause astride the day-to-day functioning of state prisons and involve the judiciary in issues

and discretionary decisions that are not the business of federal judges. We decline to so interpret and apply the Due Process Clause. The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States. *Preiser* v. *Rodriguez,* 411 U. S. 475, 491–492 (1973); *Cruz* v. *Beto,* 405 U. S. 319, 321 (1972); *Johnson* v. *Avery,* 393 U. S. 483, 486 (1969). The individual States, of course, are free to follow another course, whether by statute, by rule or regulation, or by interpretation of their own constitutions. They may thus decide that prudent prison administration requires pretransfer hearings. Our holding is that the Due Process Clause does not impose a nationwide rule mandating transfer hearings.[8]

The judgment of the Court of Appeals accordingly is

*Reversed.*

Mr. Justice Stevens, with whom Mr. Justice Brennan and Mr. Justice Marshall join, dissenting.

The Court's rationale is more disturbing than its narrow holding. If the Court had merely held that the transfer of a prisoner from one penal institution to another does not cause a sufficiently grievous loss to amount to a deprivation of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment,[1]

---

[8] Nor do we think the situation is substantially different because a record will be made of the transfer and the reasons which underlay it, thus perhaps affecting the future conditions of confinement, including the possibilities of parole. The granting of parole has itself not yet been deemed a function to which due process requirements are applicable. See *Scott* v. *Kentucky Parole Board,* No. 74–6438, cert. granted, 423 U. S. 1031 (1975). If such holding eventuates, it will be time enough to consider respondents' contentions that there is unfounded information contained in their files.

[1] "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U. S. Const., Amdt. 14, § 1.

I would disagree with the conclusion but not with the constitutional analysis. The Court's holding today, however, appears to rest on a conception of "liberty" which I consider fundamentally incorrect.

The Court indicates that a "liberty interest" may have either of two sources. According to the Court, a liberty interest may "originate in the Constitution," *ante,* at 226, or it may have "its roots in state law." *Ibid.* Apart from those two possible origins, the Court is unable to find that a person has a constitutionally protected interest in liberty.

If man were a creature of the State, the analysis would be correct. But neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen. The relevant state laws either create property rights, or they curtail the freedom of the citizen who must live in an ordered society. Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations.

A correct description of the source of the liberty protected by the Constitution does not, of course, decide this case. For, by hypothesis, we are dealing with persons who may be deprived of their liberty because they have been convicted of criminal conduct after a fair trial. We should therefore first ask whether the deprivation of liberty which follows conviction is total or partial.

At one time the prevailing view was that the deprivation was essentially total. The penitentiary inmate was considered "the slave of the State." See *Ruffin v. Commonwealth,* 62 Va. 790, 796 (1871). Although the wording of the Thirteenth Amendment provided some support for that point of view,[2] "courts in recent years have moderated the harsh implications of the Thirteenth Amendment."[3]

The moderating trend culminated in this Court's landmark holding that notwithstanding the continuation of legal custody pursuant to a criminal conviction, a parolee has a measure of liberty that is entitled to constitutional protection.

> "We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal." *Morrissey v. Brewer,* 408 U. S. 471, 482.

Although the Court's opinion was narrowly written with careful emphasis on the permission given to the parolee to live outside the prison walls, the Court neces-

---

[2] Section 1 provides: "Neither slavery nor involuntary servitude, *except as a punishment for crime whereof the party shall have been duly convicted,* shall exist within the United States, or any place subject to their jurisdiction," U. S. Const., Amdt. 13, § 1 (emphasis added).

[3] *Morales v. Schmidt,* 489 F. 2d 1335, 1338 (CA7 1973), modified on rehearing en banc, 494 F. 2d 85 (1974).

sarily held that the individual possesses a residuum of constitutionally protected liberty while in legal custody pursuant to a valid conviction. For release on parole is merely conditional, and it does not interrupt the State's legal custody. I remain convinced that the Court of Appeals for the Seventh Circuit correctly analyzed the true significance of the *Morrissey* holding, when I wrote for that court in 1973:

> "In view of the fact that physical confinement is merely one species of legal custody, we are persuaded that *Morrissey* actually portends a more basic conceptual holding: liberty protected by the due process clause may—indeed must to some extent—coexist with legal custody pursuant to conviction. The deprivation of liberty following an adjudication of guilt is partial, not total. A residuum of constitutionally protected rights remains.

> "As we noted in Morales v. Schmidt, the view once held that an inmate is a mere slave is now totally rejected. The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual.[4] 'Liberty' and 'custody' are not mutually exclusive concepts.

---

"[4] In his dissenting opinion in Morrissey v. Brewer, Circuit Judge Lay quoted the following excerpt from the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83 (1967) (hereinafter cited as Task Force Report):

'A first tenet of our governmental, religious, and ethical tradition is the intrinsic worth of every individual, no matter how degenerate. It is a radical departure from that tradition to subject a defined class of persons, even criminals, to a regime in which their right to liberty is determined by officials wholly unaccountable in the exercise of their power. . . .' 443 F. 2d [942], at 952 n. 1." 479 F. 2d, at 712–713, n. 21.

"If the *Morrissey* decision is not narrowly limited by the distinction between physical confinement and conditional liberty to live at large in society,[5] it requires that due process precede any substantial deprivation of the liberty of persons in custody. We believe a due regard for the interests of the individual inmate, as well as the interests of that substantial segment of our total society represented by inmates,[6] requires that *Morrissey* be so read." *United States ex rel. Miller* v. *Twomey,* 479 F. 2d 701, 712–713.

It demeans the holding in *Morrissey*—more importantly it demeans the concept of liberty itself—to ascribe to that holding nothing more than a protection of an interest that the State has created through its own prison regulations. For if the inmate's protected liberty interests are no greater than the State chooses to allow, he is really little more than the slave described in the 19th century cases. I think it clear that even the inmate retains an unalienable interest in liberty—at the very minimum the right to be treated with dignity—which the Constitution may never ignore.

---

"[5] See Task Force Report, at 6–12. See especially the discussion of 'Blurring Lines Between Institution and Community' at 10–11." *Id.,* at 713 n. 22.

"[6] 'A substantial portion of our population is affected by the law in this area. Approximately 1.3 million people are at any one time subject to correctional authority; untold millions have criminal records. There is increasing doubt as to the propriety of treating this large group of persons as, in varying degrees, outcasts from society. And there is increasing recognition that such treatment is not in the ultimate interests of society. Denying offenders any chance to challenge arbitrary assertions of power by correctional officials, and barring them from legitimate opportunities such as employment, are inconsistent with the correctional goal of rehabilitation, which emphasizes the need to instill respect for and willingness to cooperate with society and to help the offender assume the role of a normal citizen.' Task Force Report at 82." *Id.,* at 713 n. 23.

This basic premise is not inconsistent with recognition of the obvious fact that the State must have wide latitude in determining the conditions of confinement that will be imposed following conviction of crime. To supervise and control its prison population, the State must retain the power to change the conditions for individuals, or for groups of prisoners, quickly and without judicial review. In many respects the State's problems in governing its inmate population are comparable to those encountered in governing a military force. Prompt and unquestioning obedience by the individual, even to commands he does not understand, may be essential to the preservation of order and discipline. Nevertheless, within the limits imposed by the basic restraints governing the controlled population, each individual retains his dignity and, in time, acquires a status that is entitled to respect.

Imprisonment is intended to accomplish more than the temporary removal of the offender from society in order to prevent him from committing like offenses during the period of his incarceration. While custody denies the inmate the opportunity to offend, it also gives him an opportunity to improve himself and to acquire skills and habits that will help him to participate in an open society after his release. Within the prison community, if my basic hypothesis is correct, he has a protected right to pursue his limited rehabilitative goals, or at the minimum, to maintain whatever attributes of dignity are associated with his status in a tightly controlled society. It is unquestionably within the power of the State to change that status, abruptly and adversely; but if the change is sufficiently grievous, it may not be imposed arbitrarily. In such case due process must be afforded.

That does not mean, of course, that every adversity amounts to a deprivation within the meaning of the

Fourteenth Amendment.[7] There must be grievous loss, and that term itself is somewhat flexible. I would certainly not consider every transfer within a prison system, even to more onerous conditions of confinement, such a loss. On the other hand, I am unable to identify a principled basis for differentiating between a transfer from the general prison population to solitary confinement and a transfer involving equally disparate conditions between one physical facility and another.

In view of the Court's basic holding, I merely note that I agree with the Court of Appeals that the transfer involved in this case was sufficiently serious to invoke the protection of the Constitution.[8]

I respectfully dissent.

---

[7] "This does not mean, however, that every decision by prison officials should be subject to judicial review or that the courts rather than experienced administrators should write prison regulations. *Morrissey* reminds us that due process is a flexible concept which takes account of the importance of the interests at stake; thus, it is abundantly clear that a myriad of problems of prison administration must remain beyond the scope of proper judicial concern. Only significant deprivations of liberty raise constitutional issues under *Morrissey*. Moreover, in determining whether to require due process, we need not choose between the 'full panoply' of rights accorded a defendant in a criminal prosecution, on the one hand, and no safeguards whatsoever, on the other. Rather, as *Morrissey* aptly illustrates, the requirements of due process may be shaped to fit the needs of a particular situation." *United States ex rel. Miller* v. *Twomey*, 479 F. 2d, at 713.

[8] There is no question that respondents in this case suffered loss because of the transfer. Hathaway lost his laundry business—a source of income—which he had been running at Norfolk; Dussault lost his job as a plumber, in which he had been performing "a difficult job especially well"; Royce was separated from counselors with whom he had a "good relationship" which had helped him in his effort "to get himself together." These losses were in addition to the generally more restrictive conditions inherent in a maximum-security institution as compared to a medium-security institution.