607 F.2d 1058
 Salvatore J. RAFFONE, Plaintiff-Appellant,
v.
Carl ROBINSON, Individually and as Warden, Connecticut
Correctional Institution, Somers, and John R. Manson,
Individually and as Commissioner of the Department of
Correction, State of Connecticut, Defendants-Appellees.
 No. 72, Docket 79-2060.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 10, 1979.
Decided Oct. 18, 1979.
 
 Bart R. Schwartz, New York City (Debevoise, Plimpton, Lyons & Gates, New York City, of counsel), for plaintiff-appellant.
 Stephen J. O'Neill, Asst. Atty. Gen., Hartford, Conn. (Carl R. Ajello, Atty. Gen., D. of Conn., Hartford, Conn., of counsel), for defendants-appellees.
 Before LUMBARD, FRIENDLY and GURFEIN, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Salvatore J. Raffone, a prisoner at Connecticut Correctional Institution, Somers (C.C.I.S.), appeals from the March 31, 1978 judgment of Chief Judge T. Emmet Clarie, of the District of Connecticut, which rejects his claim to monetary damages for his confinement in "administrative segregation" without due process. Seeking damages under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3) and (4), Raffone argues that the district court erred in concluding (1) that his right to due process before being transferred to administrative segregation was not clearly established at the time of his segregation; and (2) that the defendants, the Warden of C.C.I.S. and the Commissioner of the Department of Correction, did not violate that right maliciously. We affirm.
 
 
 2
 On November 10, 1977, the body of Alfred Chisholm, a black prisoner, was found in a laundry cart near the prison's gymnasium. He had been murdered. Four days later, prison guards escorted Raffone, a white prisoner, from the general prison population specifically from his work assignment in the gymnasium to F Block, which houses prisoners assigned to administrative segregation. Five other white prisoners were also removed to F Block. When Raffone asked why he was being transferred, the escorting officer replied, "I'm not allowed to tell you anything." Two of the other transferred prisoners were told that they were "under investigation" in the Chisholm murder. The defendants returned two prisoners to the general population shortly thereafter; Raffone remained in administrative segregation until Chief Judge Clarie's judgment ordered his release on March 31, 1978.
 
 
 3
 The Connecticut Department of Correction's Administrative Directives, Chapter 2.6(a), state that prisoners may be placed in administrative segregation (1) at their own request, (2) for their protection or the institution's welfare, or (3) after punitive treatment if the inmate still cannot be returned safely to the general population. While in administrative segregation, prisoners are denied several privileges enjoyed by those in the general prison population. They are allowed out of their cell only one hour per day, instead of the sixteen hours per day allowed to prisoners in the general population. They are denied communal meals and daily showers. Their use of the library is restricted. And they are denied access to organized religious services, educational and recreational facilities, and employment opportunities. Moreover, they suffer the hardship of relative isolation from other people.
 
 
 4
 On November 22, after eight days in segregation, Raffone was taken to a Classification Committee hearing to discuss his status in segregation. The defendants gave Raffone no written notice of the hearing, and only a five-to-ten minute oral notice. They did not tell him the purpose of the hearing nor of his segregation; nor did they tell him that he could call witnesses on his behalf, present evidence, or enlist the aid of counsel. He did not ask for those rights. During the brief hearing, the Committee told Raffone that he would remain in segregation pending the Chisholm murder investigation, but it offered no further explanation. Commissioner Manson approved Warden Robinson's recommendation, which was based upon the Committee's hearing, that Raffone remain segregated indefinitely. Because the defendants expected the investigation of Chisholm's homicide to be lengthy, they then allowed Raffone some of the privileges available to prisoners in the general population, such as recreation and the use of some of his personal belongings. Shortly after the hearing, the defendants again informed Raffone, this time by letter, that he would be segregated "for investigation purposes" until the investigation concluded. Until the hearings on Raffone's complaint were held in January, 1978, that was the only reason the defendants gave Raffone for his segregation.
 
 
 5
 Raffone and three other segregated prisoners initiated this action on December 27, 1977, by writing to then District Judge Jon O. Newman. Their letter requested that the court issue an order to show cause why they should remain in administrative segregation. Chief Judge Clarie referred it to Magistrate F. Owen Eagen. On January 18, 19, and 31, 1978, Magistrate Eagen conducted hearings at C.C.I.S. At these hearings the defendants offered two reasons for confining Raffone in administrative segregation: (1) they had been told by the State Police, who were conducting the Chisholm murder investigation, that Raffone and the other segregated prisoners were prime suspects; and (2) they feared, because Raffone and the others were white while Chisholm was black, that black inmates would consider the murder racially motivated if they discovered that Raffone and the others were suspects, and that they would "racially polarize" the general population, endangering the six suspects, if not segregated, and the prison as a whole. The defendants testified that they had observed several objective indications of increased racial tension within the prison in the days following the murder: inmates huddled into small groups more than usually; informants reported that a black "militant element" was advocating retaliation against white inmates; searches revealed hidden weapons in the gymnasium, where the defendants suspected any racial incident would be likely to occur; and fewer inmates participated in evening recreation, which suggested to the defendants that the inmates themselves feared that racial confrontations might erupt. The defendants had a subjective feeling of increased racial tension as well.[1] They also testified that they had never told Raffone these reasons because they believed that further "racial polarization" would result, but they did not explain why or how they thought that would happen. The two prisoners who were segregated at approximately the same time as Raffone and shortly thereafter returned to the general population testified that they suffered no threats from black prisoners, and three black inmates testified that they had heard no rumors of threats against Raffone or the other segregated prisoners.
 
 
 6
 At the time of the hearings before Magistrate Eagen, the defendants had not returned Raffone to the general population, but Warden Robinson testified that racial tension was "back to normal" (I. e. as before the murder). The defendants presented to Magistrate Eagen no evidence of probable cause to believe that Raffone killed Chisholm. When questioned about the murder, Raffone invoked his fifth-amendment right to remain silent.[2] Raffone did not lose any "good time" credits during his segregation and his monetary losses were nominal.
 
 
 7
 On March 10, 1978, Magistrate Eagen submitted to Chief Judge Clarie findings of fact and a recommended decision that the defendants had violated Raffone's due process right, but that they were not liable for monetary damages because Raffone's right had not been clearly established and they did not violate it maliciously. Chief Judge Clarie adopted and affirmed the findings and recommendation on March 30; on March 31 he entered a judgment that ordered Raffone's release from administrative segregation but was silent as to monetary damages. Only Raffone appeals, and he appeals only the implicit denial of his claim for monetary damages.
 
 
 8
 The Supreme Court's Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), accords prison officials a qualified immunity from liability for damages under § 1983: Prison officials are not liable unless (1) the constitutional right they infringe is clearly established at the time of their conduct, or (2) they act maliciously. We agree that Raffone's due process right was not clearly established at the time of his administrative segregation and that the defendants did not act maliciously.
 
 
 9
 Raffone was held in administrative segregation from November 1977 until March 1978. Although it was well-known at that time that "a prisoner is not wholly stripped of constitutional protections when he is imprisoned for (a) crime," Wolff v. McDonnell, 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), it was not clearly established indeed it was open to real doubt that prisoners had a right to due process before being transferred from a general prison population to a confinement like administrative segregation. That doubt arose from the Supreme Court's companion decisions in Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and Montanye v. Haymes, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and the First Circuit's application of those cases in Daigle v. Hall, 564 F.2d 884 (1st Cir. 1977).
 
 
 10
 In Meachum, the Supreme Court reviewed a First Circuit decision that a transfer from a medium- to a maximum-security prison triggers due process protections because it subjects the prisoner to a more restrictive confinement. The Supreme Court reversed, holding that inter-prison transfers within a state do not trigger due process requirements, even if the prisoner is transferred to a tighter-security prison with greater restrictions on freedom and privileges, so long as state law or practice do not condition such transfers upon the occurrence of some specific event. The Court explained:
 
 
 11
 "Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.
 
 
 12
 * * * (T)o hold as we are urged to do that Any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U.S. at 225, 96 S.Ct. at 2538 (emphasis original).
 
 
 13
 The First Circuit decision reviewed in Meachum had not distinguished between transfers for administrative and transfers for punitive reasons. 427 U.S. at 222 n. 6, 96 S.Ct. 2532. The Second Circuit decision that the Supreme Court reviewed in Montanye had drawn that distinction, requiring procedural due process only for Disciplinary transfers having a substantial adverse impact on the prisoners. 427 U.S. at 242, 96 S.Ct. 2543. Thus, even before Meachum and Montanye it would not have been clear under Second Circuit caselaw that Raffone's transfer to administrative segregation would have required due process. Then in Montanye the Court reversed this circuit's decision by holding that prisoners may be transferred between prisons without due process, even to a more severe regimen and for either administrative or disciplinary reasons, so long as, under state law, such a transfer is not conditional upon or limited to the occurrence of some specific event. 427 U.S. at 215, 96 S.Ct. 2532, and 236, 96 S.Ct. 2543.
 
 
 14
 In Daigle, the First Circuit applied Meachum and Montanye to an Intra -prison transfer similar to Raffone's. It held that due process was not triggered by a transfer from the general prison population to the Departmental Segregation Unit (DSU). According to Massachusetts law, prisoners can be transferred to the DSU if their "continued retention in the general institution population is detrimental to the program of the institution" or if their behavior creates "serious management problems and/or security hazards." 564 F.2d at 885. The court stated that "the DSU is part of the Massachusetts prison system to which these inmates were sentenced. We are pointed to nothing in the order of the sentencing judge that puts the DSU beyond the bounds of their sentences." 564 F.2d at 885. It then concluded that the state statutes and regulations governing transfers to the DSU were too generally phrased to read to condition transfers upon the occurrence of any specific event. It therefore held that the prisoner had no right to due process before being transferred to the DSU.
 
 
 15
 Thus, at the time Raffone was removed to administrative segregation, the Supreme Court caselaw indicated that transfers did not necessarily require procedural due process even if they substantially deprived a prisoner of privileges, and the First Circuit caselaw indicated not only that that rule applied to an intra-prison transfer, but that state laws only slightly more general than the Connecticut Department of Correction's Administrative Directives would not be read to condition such transfers upon the occurrence of a specific event. Cf. Cofone v. Manson, 594 F.2d 934, 938 (2d Cir. 1979). To be sure, a federal district court in the Northern District of California had reached a result contrary to Daigle. That district court held in September 1976 (two months after the Supreme Court announced Meachum and Montanye ) that administrative segregations like Raffone's, because they are significantly more burdensome than general confinement, do not fall within the normal limits or range of a prisoner's sentence, and that regulations like Connecticut's Administrative Directives can be read to condition transfers upon a specific event. Wright v. Enomoto, 462 F.Supp. 397 (N.D.Calif.1976). And the Supreme Court eventually affirmed that decision although without opinion, Sub nom. Enomoto v. Wright, 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978) after the events here in question. But one district court does not alone clearly establish a right. The defendants cannot be required to predict the course of constitutional law, Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), nor can they fairly be required, upon pain of money damages, to stay abreast of district court caselaw from across the country.
 
 
 16
 Even if Raffone's due process right was not clearly established at the time of his segregation, the defendants would lose their immunity from liability for damages under § 1983 if they had acted maliciously. We agree with the district court that they did not. C.C.I.S. is a maximum-security prison with roughly equal numbers of black and white prisoners. A black inmate had just been murdered. The prime suspects were white. The defendants observed several objective indications of increased racial tension. In sum, they had ample reason to be anxious about Raffone's safety and to segregate him so as to protect it. This is not to say, however, that the defendants could not have accorded Raffone more process than they did, even if not required to. The defendants have failed to explain why, even in a maximum-security prison with obvious racial tension, they could not have told Raffone the purpose of his segregation, why they could not have held a Classification Committee hearing before letting eight days lapse, or why they could not have notified Raffone of the hearing and its purpose sooner than ten minutes before it convened. But the question before us is only whether the defendants acted maliciously, not what process was due before they could transfer Raffone to administrative segregation.
 
 
 17
 Thus, because the defendants neither violated a clearly established constitutional right nor acted maliciously, they are immune from liability for monetary damages under § 1983, and we affirm.
 
 
 
 [1]
 Defendants' actions must of course be judged as of the time they took them, but these subsequent events are relevant in confirming the concerns upon which prison officials claim they acted
 
 
 [2]
 Since the hearings before Magistrate Eagen, Raffone has admitted to complicity in Chisholm's murder and has been indicted. He is currently in a prison in Minnesota awaiting trial, having been transferred there for his own safety after being attacked and stabbed by another C.C.I.S. inmate in August 1978