Gary W. **EGGLETON**, Plaintiff,

v.

John **GLUCH**, et al., Defendants.

Civ. A. No. 88–CV–71065–DT.

United States District Court,
E.D. Michigan, S.D.

July 13, 1989.

8.

(Pl's Exs 25 and 26)

Paul D. Reingold, Ann Arbor, Mich., for plaintiff.

Carolyn Bell Harbin, Asst. U.S. Atty., Detroit, Mich., for defendants.

## OPINION AND ORDER

## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DUGGAN, District Judge.

This is a civil rights action stemming from plaintiff's incarceration at the Milan, Michigan federal correctional facility.[1]

Plaintiff complains that defendants Gluch (the warden), Graham (chief correctional supervisor) and Bledsoe (unit manager) deprived him of rights protected by the fifth and eighth amendments to the U.S. Constitution. Pursuant to 28 U.S.C. § 636(b)(1)(B), Magistrate Paul J. Komives reviewed cross-motions for summary judgment filed with the Court, and issued a report to which defendant Gluch and plaintiff have timely objected. The Court presently undertakes "a de novo determination of those portions of the [Magistrate's] report or specified findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). A brief summary of the facts and contentions follows.

On November 10, 1986, plaintiff was placed in administrative detention, suspected of planning a prison escape. Prison authorities, under the alleged oversight of defendant Gluch, conducted an internal investigation. On February 17, 1987, plaintiff was charged with attempted escape in violation of prison regulations. (A criminal complaint was filed and, later, voluntarily dismissed.) A disciplinary committee headed by defendant Graham, considered the charge unfounded. Plaintiff, nevertheless, remained in detention and subsequently faced a second charge of conspiring to escape, in violation of prison regulations. The committee, this time chaired by defendant Bledsoe, again cleared him, yet his release into the general inmate population, *i.e.*, from administrative detention, was not forthcoming. Instead, and consistent with his earlier security reclassificaiton, plaintiff was transferred to a Virginia facility which housed inmates posing a greater security risk.

Plaintiff seeks damages on essentially three grounds. He *first* contends that, contrary to 28 C.F.R. § 541.22, the reason for his detention was not communicated, and formal, periodic review of such detention withheld. *Second*, plaintiff attacks the prison disciplinary proceedings brought against him, complaining that he was

---

**1.** Plaintiff is currently incarcerated in Petersburg, Virginia. This lawsuit was transferred from the U.S. District Court, Eastern District of Virginia.

wrongfully "tried" twice for the same alleged misconduct. Thus, having been "acquitted" of the attempted escape charge, he maintains the conspiracy charge should *not* have been pressed. This second contention also derives, in large part, from agency regulations, specifically 28 C.F.R. § 541.13, which, according to plaintiff, is structured to avoid *multiple* disciplinary proceedings. Plaintiff also invokes the principle of collateral estoppel. *Third,* plaintiff submits that his security reclassification and ultimate transfer were punitive measures, ordered in retaliation for his successful defense of the prison charges, and thus actionable as such. *See Mc-Donald v. Hall,* 610 F.2d 16 (1st Cir.1979).

Defendants primarily argue that applicable regulations were observed. The following passage is illustrative:

> [P]laintiff's entire administrative detention was justified on the grounds that there was a continuing investigation of a criminal act or [of a prison rule violation], and these bases for administrative detention were not negated by virtue of the "not guilty" determination[s] by the ... [disciplinary committee]. Since plaintiff had already received notice of the reason for his detention via the original administrative detention order, no additional notices were required.

(Defendant Gluch's objections, at 6). Admittedly, then, in the avowed interest of *prison security,* plaintiff's plea of innocence was disregarded. Thus, because the attempted escape charge lacked proof of an overt act and, in defendants' view, was on this basis dismissed, the conspiracy charge requiring no such proof was brought. Furthermore, given the investigation into plaintiff's conduct, the pendency of which, defendants submit, precluded his release from detention, formal review of such detention pursuant to 28 C.F.R. § 541.22(c) was not afforded. Rather, inquiry was periodically made as to plaintiff's health and, generally, the *conditions* of detention. Finally, as noted above, plaintiff was transferred to an increased security facility. Defendants additionally note, however,

that plaintiff had earlier requested a transfer to be closer to his family, and suggest that plaintiff's desire factored into the transfer decision.

Alternatively, defendants deny personal involvement on their part which constitutes a constitutional deprivation. Defendants further argue that, even if this Court should conclude that their conduct (personal involvement) was such that it might constitute a constitutional deprivation, they are, nevertheless, immune from a claim for damages based on the doctrine of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1981), defendants advise, teaches

> that governmental officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738 (citations omitted).

The Magistrate in the matter at bar concludes that plaintiff's continued detention after the second "acquittal" was unconstitutional, *i.e.,* a deprivation of a protected liberty interest without due process of law. He also believes that plaintiff's claim that his reclassification and/or transfer were in "retaliation" for being twice acquitted raises a genuine issue of material fact justifying the denial of a summary judgment. Citing their lack of personal involvement, Magistrate Komives would *not* hold defendants Graham and Bledsoe accountable for the constitutional violation or the, as yet, unresolved retaliation claim. The Magistrate, in contrast, recommends summary judgment *against defendant Gluch* and in favor of plaintiff on the continued detention claim, and would reserve "the retaliatory transfer/reclassification issue for trial between plaintiff and defendant Gluch." Report and Recommendation, at p. 11.[2] Central to the Magistrate's recommendation is his analysis of the qualified immunity contention defendants interpose:

**2.** In all other respects, the Magistrate rejects     plaintiff's claims.

Defendants also assert qualified immunity as a basis for dismissal. I disagree. Two of plaintiff's claims will survive defendants' Motion for Summary Judgment if the Court accepts this Report: (1) continued detention after acquittal, and (2) retaliatory transfer/reclassification. Indeed, I have recommended judgment in plaintiff's favor on the continued detention claim.

I conclude that qualified immunity does not apply in either instance because the law was clearly defined in each of these areas. I do not, therefore, recommend dismissing any of plaintiff's remaining claims based on the qualified immunity defense.

*Id.* at 10. This Court disagrees with the Magistrate's interpretation and application of the doctrine of qualified immunity.

■■ The United States Supreme Court clarified the doctrine in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court began by reaffirming the standard announced in *Harlow, supra:*

[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action[,] *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739, assessed in light of the legal rules that were "clearly established" at the time it was taken, *id.,* at 818, 102 S.Ct. at 2738.

107 S.Ct. at 3038. In a passage particularly pertinent to the due process claims confronting this Court, the Supreme Court elaborated:

The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violated that clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading....
It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see *Mitchell [v. Forsyth ],* 472 U.S. [511] at 535, n. 12, 105 S.Ct. [2806] at 2820, n. 12 [86 L.Ed.2d 411 (1985) ]; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

107 S.Ct. at 3038–3039. In this Court's opinion, the Magistrate failed to properly evaluate the conduct of the defendants by making the appropriate "fact-specific" inquiry. "The relevant, fact-specific question in qualified immunity cases is whether any official could have, in light of the preexisting law, reasonably believed that his action was lawful." *Danese v. Asman,* 875 F.2d 1239, 1242 (6th Cir.1989).

■■ Therefore, in determining whether or not these defendants are entitled to the defense of qualified immunity, this Court must address the "fact-specific" question of whether a reasonable person could have believed that the conduct plaintiff now complains of was lawful, taking into consideration all of the information the defendants possessed and the preexisting judicial interpretation of the Due Process Clause. *Anderson,* 107 S.Ct. at 3040. Answering

this question,[3] the Court finds defendants' actions objectively reasonable. In this Court's opinion, qualified immunity thus attaches.

■ The F.B.I.'s investigation justified plaintiff's detention on November 10, 1986. See 28 C.F.R. § 541.22(a)(3) which provides in part:

The Warden may also place an inmate in administrative detention when the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates or to the security or orderly running of the institution and when the inmate:

(3) Is pending investigation or trial for a criminal act[.]

*Ibid.* Detention, however, is not without procedural safeguards. Thus, a warden is instructed to

prepare a memorandum detailing the reasons for placing an inmate in administrative detention, with a copy given to the inmate.... Staff shall deliver this memorandum to the inmate within 24 hours of the inmate's placement in administrative detention.

28 C.F.R. § 541.22(b). Here, a memorandum was timely filed. Contrary to plaintiff's contention, it is of no legal consequence, in the Court's opinion, that such memorandum recites the language of 28 C.F.R. § 541.22(a)(2) (inmate may be detained "pending an investigation of a violation of Bureau regulations") rather than section 541.22(a)(3), quoted earlier. The Court notes in this vein, that prison administrators cooperated with F.B.I. agents, thereby blurring the distinction between subsections (a)(2) and (a)(3). Simply put,

defendants' reliance on (a)(2), even if mistaken, is understandable and, therefore, not actionable. Furthermore, defendants' explanation that additional written notices were not given in connection with plaintiff's *continued* detention because he "had already received notice of the reason for his detention via the original ... detention order," is likewise reasonable and, thus, does *not* predicate an action for damages.

28 C.F.R. § 541.22(c) also provides procedural safeguards:

(c) *Review of inmates housed in administrative detention.* (1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear....

*Ibid.* Notwithstanding the directives of section 541.22(c), it was the practice at the Milan facility for the staff, when reviewing the status of an inmate detained pending investigation, to defer consideration of the propriety of detention to the "Captain", *i.e.*, defendant Graham, as the Warden's designate. See the supplemental declara-

---

**3.** This is a legal question to be decided by the Court. *See Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). The Court acknowledges plaintiff's suggestion that under the guise of an ongoing investigation, administrative segregation was used as a pretext for indefinite discipline, used that is, for a punitive purpose. Plaintiff thus implies that summary judgment is inappropriate where, as he believes here, subjective intent is at issue. The Court rejects plaintiff's invitation to consider defendants' subjective intent. A contrary result would, as explained in *Martin v. District of Columbia Metropolitan Police Dep't,* 812 F.2d 1425 (D.C.Cir.1987),

reimpose "precisely the burden *Harlow* sought to prevent." *Hobson* [*v. Wilson*], 737 F.2d [1] at 29 [ (D.C.Cir.1984) ]. Before *Harlow,* "an official's subjective good faith ha[d] been considered to be a question of fact ... inherently requiring resolution by a jury." *Harlow,* 457 U.S. at 816, 102 S.Ct. at 2737. That approach produced results "incompatible with [the Supreme Court's] admonition in *Butz* [*v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ] that insubstantial claims should not proceed to trial. *Id.* at 815–16, 102 S.Ct. at 2737.

*Martin,* 812 F.2d at 1435.

---

tion of Ray S. Hooker, at paragraph four, which reads:

> In cases of protective custody, holdovers, pending transfers and investigations, release authority resides with the Captain as deligated by the Warden. As plaintiff's was a case of detention for investigation, the reviewing staff (unit staff) would not consider nor determine the propriety of the plaintiff's placement in administrative detention, but defer to the Captain through automatically checking [a form's blank] for continuing in special housing. The sole purpose of the review in cases such as this is to see that the conditions of confinement in Administrative Detention meet Bureau standards (seen by medical staff, showers, exercise, complaints about the number of blankets, needs toilet paper, etc.).

*Ibid.* Defendant Graham chose not to release plaintiff citing, *inter alia*, "the continuing F.B.I. involvement for possible prosecution." (Declaration of James Graham, at paragraph three.) Importantly, however, the record does *not* evidence any involvement on plaintiff's part in the review process. Such exclusion predicates, in part, his due process claim.

Assuming, without deciding, that due process was not afforded, the Court is nonetheless satisfied that qualified immunity bars recovery of damages. The F.B.I.'s continuing investigation of plaintiff's alleged involvement in the escape plan was justification for the defendants' conduct in denying plaintiff's release from detention. Richard J. Heideman, Special Agent with the Federal Bureau of Investigation, stated in an affidavit filed on March 29, 1989:

9. Between October 1986 and April of 1988, I continued my investigation of the case, and continued to seek prosecution of Eggleton by the United States Attorney's Office, which had sole authority to initiate a prosecution action.

10. During this period of time, I remained in frequent contact with Warden Gluch and with James Graham, Captain at F.C.I., Milan, and each was advised that my efforts to seek prosecution of Eggleton were continuing.

The continuing F.B.I. investigation also serves to excuse the failure to solicit plaintiff's input in the review process. Simply stated, plaintiff's protests to defendant Graham (or any other prison official) would not have altered the *F.B.I.*'s decision to continue its investigation.

■ Plaintiff's remaining charges—that he was wrongfully "tried" twice, and that defendants retaliated against him—to be actionable, must derive from the rules or regulations which, by implementing procedural requirements or incorporating substantive limitations, restrict the prison officials' discretion. *See Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980). Such charges do *not*, in this case derive from any discretion-limiting rules or regulations. Consequently, a liberty interest protected by the Due Process Clause is not at issue. Indeed, with respect to plaintiff's transfer claim, the United States Supreme Court has spoken: "Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another." *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538–39, 49 L.Ed.2d 451 (1976).[4]

---

**4.** Informed of the *Meachum* holding, extended in *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the court in *McDonald v. Hall,* 610 F.2d 16 (1st Cir.1979) nevertheless opined:

> [A prisoner] may establish a claim under § 1983 if the decision to transfer him was made by reason of his exercise of constitutionally protected First Amendment freedoms....

*Id.* at 18. Plaintiff's citation to *McDonald* is misplaced. The narrow question presented there was whether the complainant stated a claim for relief. Here, plaintiff must avoid summary judgment in the manner prescribed by *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *i.e.,*

> to go beyond the pleadings and by [his] own affidavits, or by the "depositions, answers, to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial."

*Id.* at 324, 106 S.Ct. at 1, *quoting* Fed.R.Civ.P. 56(e). Moreover, because immunity is at issue today, plaintiff cannot rely on inferential or circumstantial support. *Martin, supra* at 1435 n. 3. He adduces no direct evidence of retaliatory motive.

Again assuming that plaintiff's "tried twice" and "retaliation" claims do trigger due process protection, qualified immunity operates as a defense. In the Court's assessment, defendants' actions were reasonable. The second prison misconduct charge was brought in response to the perceived shortcomings of the first "prosecution". As to plaintiff's retaliation charge, the decision to reclassify and transfer took place in early 1987. (The transfer took place on May 22, 1987). As previously indicated by Special Agent Heideman's affidavit, the F.B.I. investigation into plaintiff's involvement in the alleged escape plan was ongoing. The affidavits of the defendants indicate a continuing concern for security. (See *Gluch* affidavit, filed March 29, 1989, at paragraph 5; Graham affidavit filed that same day, at paragraphs 3, 4). Given the information possessed by the defendants and the fact of the continuing investigation by the F.B.I., this Court concludes, as a matter of law, that "any official could have, in light of the preexisting law, reasonably believed that his action was lawful." *Danese v. Asman, supra,* at 1242. Defendants are therefore entitled to summary judgment on this issue.

In short, this Court will *not*, with the aid of hindsight, second-guess the professional judgment of prison authorities. As alluded to in *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), the problems of prison administration are both many and complex, and "not readily sus-ceptible of resolution by decree." *Id.* at 351, 101 S.Ct. at 2401, *quoting Procunier v. Martinez,* 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). The facts of this case, involving a suspected planned prison escape and F.B.I. intervention, are illustrative.

Taking into account the information available to them and preexisting law,[5] the unlawfulness of defendants' conduct is not "apparent". *Anderson, supra,* 107 S.Ct. at 3039.

For the reasons stated above,

IT IS ORDERED that defendants' Motion for Summary Judgment is GRANTED.

---

5. Cited by plaintiff, the decision in *Childs v. Pellegrin,* 822 F.2d 1382 (6th Cir.1987) supports this conclusion. In *Childs,* the plaintiff was accused of precipitating a prison yard work stoppage, and placed in administrative segregation. A review board later recommended that he be released into the general prison population. Plaintiff's suit complained of the delay in effecting such release. The court remarked:

> Although the review board recommended on July 27, 1983, that Childs be retransferred, the prison warden determined that he should be held in segregation until an independent investigation of the work stoppage could be completed. It thus appears that Childs may have been held for two months simply so that the warden could be satisfied by independent evidence that Childs' claims of innocence were legitimate. Given the "relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials,"

*Hewitt [v. Helms ],* 459 U.S. [460] at 476 n. 8, 103 S.Ct. [864] at 874 n. 8 [74 L.Ed.2d 675 (1983)], as well as the seriousness of the allegation that an inmate was the instigator of a violent prison uprising involving hundreds of prisoners, we do not consider the warden's two-month delay in clearing Childs to be unreasonable. Nor was the warden unjustified in retaining Childs in administrative segregation during this period.

822 F.2d at 1388.

> The Court also notes that plaintiff does not support, by way of argument and/or citation, the eighth amendment claim contained in his complaint. If not already abandoned, the Court dismisses such claim finding no evidence of wantonly inflicted *pain* or punishment disproportionate to his conviction, *i.e.,* the twin evils the amendment prohibits. *Rhodes, supra,* at 346, 101 S.Ct. at 2398–99.