October 10, 1978

## 78-57   MEMORANDUM OPINION FOR THE DIRECTOR, BUREAU OF PRISONS

### Bureau of Prisons—Involuntary Transfers of Prisoners to Segregation—Due Process Safeguards in Administrative and Disciplinary Segregation

This responds to your memorandum requesting clarification and reconsideration of our May 10 and May 16 memoranda to the Assistant Attorney General of the Office of Legislative Affairs. Those memoranda expressed our views as to the due process safeguards required with respect to involuntary transfers of prisoners from the general prison population to segregated status.

(1) You state that you understand that our memoranda deal only with transfers from the general prison population to segregation rather than placement in segregation in all situations. Your understanding is correct. We expressly stated that our consideration was limited to transfers from the general prison population to segregation. Although we do not consider situations in which inmates are placed in segregation awaiting classification or transfer, we note that other considerations may call for a procedure different from that required in transfers to segregation from the general prison population.

(2) You also ask whether the Bureau of Prisons' procedure regarding administrative detention pending either disciplinary proceedings or investigation is constitutionally acceptable. You state that these inmates are given full hearings pursuant to *Wolff* v. *McDonnell,* 418 U.S. 539 (1974), within 2 to 4 days following imposition of segregation, if they are to be kept in segregation beyond this period. In this context you ask whether we believe an independent hearing on the reclassification issue is required. Two hearings are not required in such situations. Your use of administrative detention in disciplinary cases is actually a part of the disciplinary proceeding. Where due process safeguards attach to the disciplinary proceeding no purpose would be served by conducting two independent hearings on the same basic facts. Our opinion is that administrative segregation cannot properly serve as a substitute for disciplinary segregation so as to avoid the requirements of *Wolff.*[1] Thus, as long as the pending hearing for the segregated inmate is not unreasonably

---

[1] You state that you agree that it would be wrong to use administrative detention to circumvent *Wolff's* due process requirements in disciplinary proceedings.

delayed, the hearing on the charged violation would accord the inmate any process to which he is due.[2]

(3) Finally, you express concern over our equating involuntary administrative segregation[3] with disciplinary segregation. You point out that inmates subjected to administrative segregation are extended the same benefits as inmates in the general prison population, to the extent that such segregated status allows. You state that administrative detainees are permitted "reading materials, personal property, visits, correspondence, commissary-purchase privileges," and that many work in the unit out of their cells.[4] Further, you indicate that such segregated status is not a negative factor in parole or later programming decisions. And finally, you stated that "[i]n no case are these people considered undergoing sanction."[5]

In cases where involuntary administrative detention is ordered "for the inmate's own protection," we understand your position to be that no due process hearing is required. The view you urge would accord a hearing prior to the imposition of segregation to one who, no matter how egregiously, violated prison rules, but would not extend the opportunity for a hearing to one who had violated no rule. Such a result is inconsistent with the appearance of even-handed administration of prison rules and notions of fair play.[6] The focus should not be on the punitive or nonpunitive intent of prison officials, but on the deprivation itself. In *Powell* v. *Ward*, 392 F. Supp. 628 (S.D.N.Y. 1975), *aff'd* 542 F. (2d) 101 (2d Cir. 1976), the court noted that:

> In New York, there are two basic types of disciplinary procedures, Superintendent's Proceedings and Adjustment Committee Proceedings. 7 N.Y.C.R.R. §§ 252, 253. *The Adjustment Committee Proceeding is "said to be marked by flexibility and nonpunitive intent* in attempting to effectuate changes in inmate attitude," whereas the

---

[2]We are assuming that such prehearing detention would be imposed consistent with the Bureau of Prisons' Policy Statement No. 7400.5D (July 7, 1975), *i.e.*, only where the continued presence of the inmate in the general population poses a serious threat to life, property, persons, or the security of the institution.

[3]We use this term as synonymous with "administrative detention."

[4]These same privileges are not available to those in a disciplinary status.

[5]It may prove helpful at this point to identify the types of administrative segregation that we are not discussing. First, we are not concerned with administrative segregation that is an adjunct of a disciplinary proceeding involving a *Wolff*-type hearing within a reasonable interval after the imposition of administrative segregation. Neither are we discussing segregation imposed pending classification, transfer, or where an inmate is in a holdover status during transfer. And, inmate requests to be placed in administrative segregation are not relevant to our discussion because they do not involve involuntary confinement. Thus, there is only one class of cases in which our discussion of the distinction between administrative and disciplinary segregation applies. That is, where the prison staff, against the inmate's protest, determines "that admission to or continuation of Administrative Detention is necessary for the inmate's own protection."

[6]It appears that in both cases there is a factual predicate for imposition of segregation. For administrative segregation to be imposed it must be established that the inmate's presence in the general population poses a danger to himself, others, institutional security, etc. Because of this there should be minimum procedural safeguards to protect against an arbitrary determination of this factual predicate. *Cf.*, *Wolff* v. *McDonnell, supra*, at 571, n. 19, and *Wright* v. *Enomoto, infra; contra, Bills* v. *Henderson*, 446 F. Supp. 967, 973 (E.D. Tenn. 1978).

> Superintendent's Proceeding is "solely disciplinary in nature."
> [Citation omitted.] Despite different goals and procedures, both types
> of proceedings may result in solitary confinement. [Emphasis added.]

The court held that because both the punitive and the nonpunitive proceedings may result in solitary confinement, "inmates subject to either type of proceeding must be accorded the procedural safeguards set forth in *Wolff* v. *McDonnell* [418 U.S. 539 (1974)]." *See also, McKinnon* v. *Patterson,* 568 F. (2d) 930, 938 (2d Cir. 1977); *Crooks* v. *Warne,* 516 F. (2d) 837, 839 (2d Cir. 1975).

While the above-cited cases do not excuse due process requirements for administrative segregation, it is recognized that the hearings required in administrative proceedings need not be identical to disciplinary proceeding hearings; the institutional concerns in the two proceedings are not necessarily the same. Accordingly, the court in *Crooks* v. *Warne,* 516 F. (2d) 837, *supra,* held that:

> . . . there must be a mutual accommodation between institutional
> needs and generally applicable constitutional requirements, and to the
> nature of a hearing before an adjustment committee which has the
> duty of determining whether the particular prisoner may safely be
> returned to the general population, as distinguished from finding
> whether the inmate has violated a particular rule. [*Id.,* at 839]

Thus, the Court of Appeals for the Second Circuit reversed the district court's order that "[n]o member of any Adjustment Committee meeting to which Plaintiff is a party shall discuss the pending matter with other administrative or superior officers in advance of the hearing," *id.,* reasoning that the nature of such an administrative hearing required previous consultation between prison officials. However, the court affirmed the lower court's ruling that the inmate must be notified prior to the hearing as to the basis for the proposed transfer to segregation. The prison procedure at issue in *Crooks* afforded the inmate an opportunity to respond at the hearing. The basic question at issue was whether prior notice to the prisoner was required. While the basic due process requirements were held to apply to administrative detention *(see also, McKinnon* v. *Patterson,* 568 F. (2d) 930, 938 (2d Cir. 1977)), the court ruled that the requirement of an impartial administrative officer to preside over the hearing was not identical in administrative and disciplinary hearings.

Apart from the punitive versus nonpunitive intent distinction, administrative and disciplinary segregation are also distinguished, based on the facts that inmates in administrative segregation retain more privileges than those in disciplinary segregation and are not stigmatized to the same degree as disciplinary detainees. Thus, the issue is whether these facts remove administrative segregation from the kind of segregated status requiring due process safeguards. In *McKinnon* v. *Patterson, supra,* the Second Circuit viewed situations involving prisoners confined to their cells and deprived of almost all contact with the rest of the prison population and participation in the normal

235

routine of the institution, as requiring the due process guarantees of *Wolff*. The court noted that the deprivation was less severe than solitary confinement or confinement in a special housing unit. The confinement at issue in *McKinnon* could not exceed 2 weeks. Further, prisoners in such confined status retained access to their personal belongings. Thus, they enjoyed reading material and the use of any other personal property generally permitted in prison cells.

The Court of Appeals in *McKinnon* compared the confinement there with that in *Walker* v. *Mancusi*, 467 F. (2d) 51 (2d Cir. 1972), affirming 338 F. Supp. 311 (W.D. N.Y. 1971). There the district court found that a due process hearing was required in the segregation process even though the prisoners retained several benefits, including receipt of the minimum wages paid to inmates unassigned to jobs through no fault of their own, commissary privileges, receipt of packages from outside the prison, and recreation during their first week of punitive confinement.[7] *McKinnon* v. *Patterson, supra,* 938, n. 7. In *McKinnon* no mention was made of the segregation as it affected parole, eligiblity for future rehabilitative programs, etc. The court focused on the restrictive confinement as the key factor in deciding whether an inmate's custody status amounted to solitary confinement. Most of the cases you have cited do not undermine *McKinnon*. They merely stand for the proposition that due process is not triggered in decisions affecting furloughs, inmate access to institutional programs, and other like programs conferring "privileges."[8]

However, *Walker* v. *Hughes,* 558 F. (2d) 1247 (6th Cir. 1977), held that short of cruel and unusual punishment, due process is not triggered by any deprivation of an inmate's freedom unless a "liberty interest" is conferred by statute or prison rules or regulations. *But see* the dissenting opinion of Judge Edwards, who opined that a *Wolff* hearing "must be provided when a prisoner is placed in segregation." *Id.,* at 126. Following the *Walker* v. *Hughes* holding, a court in the Sixth Circuit also found no liberty interest, absent statute or rule, in remaining in the general prison population. *Bills* v. *Henderson,* 446 F. Supp. 967 (E.D. Tenn. 1978). Under the rationale of these cases prison officials could impose disciplinary or administrative segregation for any reason or for no reason unless the exercise of their discretion were circumscribed by statute or rule.

This conclusion, however, conflicts with *Wright* v. *Enomoto,* No. C-73-1422 SAW (N.D. Cal. 1976) (3-judge court), *aff'd,* 434 U.S. 1052, 98 S. Ct. 1223

---

[7]While it is true that *Mancusi* was pre-*Wolff, McKinnon* endorses the approach taken in that case. 568 F. (2d) at 935-36.

[8]*Moody* v. *Daggett,* 429 U.S. 78 (1976) (classification and institutional programs affected. Court held that no due process hearing required in such circumstances); *Solomon* v. *Benson,* 563 F. (2d) 339 (7th Cir. 1977) (classification of prisoner as special offender does not require due process protections); *Smith* v. *Saxbe,* 562 F. (2d) 729 (D.C. Cir. 1977) (furlough termination and transfer to another institution requires no due process hearing).

(1978),[9] and *Wolff* v. *McDonnell*, 418 U.S. 539 (1974). In *Enomoto*, the 3-judge court's unpublished order and opinion condemned the arbitrary imposition of segregation, whether labeled disciplinary or administrative.[10] The court in *Enomoto* viewed administrative segregation as an even greater deprivation than disciplinary segregation. And although the court did not reach the question "whether even more procedural protections must be required" for administrative segregation, it noted:

> The deprivation suffered by a prisoner confined for administrative reasons is greater than that suffered by one confined on a disciplinary charge. The latter is for a definite term, generally for a maximum of ten days. In contrast, administrative segregation is for an indefinite period—the prisoner may be confined for months, even years, · without hope of release. The charges at a disciplinary hearing are definite and narrow. The inmate is accused in writing of violating a prison rule. In contrast . . . the charges at a hearing resulting in administrative confinement tend to be vague, and are frequently based on mere rumor, suspicion, or conjecture. In this connection we deem it appropriate to note that the circumstances and issues involved in decisions leading to administrative segregation may well, upon a proper showing, demonstrate the necessity for additional procedures to make hearings adequate. (Footnote omitted.) [*See generally* Tobriner & Cohen, *How Much Process is "Due"? Parolees and Prisoners,* 25 Hastings L.J. 801 (1974); *Gagnon* v. *Scarpelli,* 411 U.S. 778, 790 (1973); N. Morris, *The Future of Imprisonment* 30-34, 67-73 (1974). *Enomoto, supra,* slip opinion at 17-18.]

Although *Enomoto* is not without contrary authority (*see, Walker* v. *Hughes, supra*), it is the only case on this subject we have found that has been reviewed by the Supreme Court after its decisions in *Meachum* v. *Fano,* 427 U.S. 215

---

[9]In a May 23, 1978, memorandum from you to the Associate Deputy Attorney General, you stated that you ". . . have been advised that the rules of the Ninth Circuit [Court of Appeals] bar the citation of an unreported opinion within that circuit." Based on this advice, you question our reliance on an "unreported and uncitable District Court opinion." The advice you were given regarding the rules is erroneous. The relevant rule is Rule 21 (as amended through February 7, 1977). This rule establishes a rather detailed policy as to how the court disposes of matters before it. We note that "publication," under Rule 21, carries a different meaning than your memorandum implies by use of the term "unreported." It suffices here, however, to point out that the rule applies only to cases decided by the Ninth Circuit Court of Appeals. Subsection (c) of Rule 21 states that:

> A disposition which is not for publication shall not be regarded as precedent and shall not be cited to or by this court or any district court of the Ninth Circuit, either in briefs, oral argument, opinions, memorandums, or orders, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.

This provision expressly applies only to dispositions by the Ninth Circuit Court of Appeals. It does not purport to impose rules concerning the precedential value of decisions by district courts within that circuit. *See* subsection (a) of that rule.

[10]You have provided the example of procedures required in classifying "central Monitoring cases (those who must be carefully followed, to make sure they are not confined in the same place as certain others, etc.)." It is our understanding that these cases are not equivalent to segregation. Accordingly, we express no opinion on the adequacy of the procedures afforded in those areas.

(1976), and *Montanye* v. *Haymes*, 427 U.S. 236 (1976). There is always a question about the precedential weight that should be accorded Supreme Court summary affirmances of three-judge court decisions. To be sure, a reasonable argument can be made that *Enomoto* is wrongly decided. On the other hand, the due process analysis embraced by the *Enomoto* court is, we think, compatible with the Supreme Court's other recent due process decisions, and the arguments against extending the notice and hearing protections to the category of involuntary confinement addressed here are less persuasive. For these reasons we adhere to our previously stated view that involuntary placement in administrative segregation, even absent statute or rule,[11] triggers due process guarantees.[12]

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11]As we stated in our May 10, 1978 memorandum to the Office of Legislative Affairs, we believe that the Bureau of Prisons' Policy Statement No. 7400.5D and 18 U.S.C. § 4081 create a protected interest in remaining in the general prison population whether or not such interest derives from the Constitution.

[12]However, as we stated above, we only comment on those transfers to segregation from the general population that are not part of a proceeding for which a *Wolff*-type hearing is afforded within a reasonable period after imposition of segregation.