## A00A0002. SAWYER v. COLEMAN et al.
### (537 SE2d 193)

POPE, Presiding Judge.

This case arises out of the tragic circumstances surrounding a 14-year-old boy's suicide by jumping from a two-story fire escape. At the time of his death, the boy was in the custody of the Department of Children & Youth Services (DCYS) in Walton County. Janice Sawyer, the boy's mother, brought suit against Leslie Coleman, her son's probation officer, and Margaret Laskey, Coleman's supervisor, asserting numerous federal and state claims.[1] The trial court granted Coleman and Laskey summary judgment on all claims, but Sawyer's appeal challenges only the grant of summary judgment on her federal constitutional claims.

In October 1993, Sawyer's son, Michael Grubbs, was found delinquent and committed to the DCYS on charges of abusive and obscene language, truancy, violation of probation, runaway and unruly. Michael's case was assigned to Coleman. At the time, she was employed as a juvenile probation officer and court service worker by the DCYS, working out of the juvenile probation office in Walton County. Her duties included supervising juveniles such as Michael, who resided in Walton County and were placed in DCYS custody. Laskey was the unit director and supervisor of the DCYS offices in Walton County and Newton County.

After a brief detention in a Regional Youth Development Center (RYDC), Michael completed a Wilderness School program. He then spent a short, unsuccessful stay at home before being assigned to a group home in Augusta. On February 17, 1994, after staying in the group home for one day, Michael ran away and returned to his mother's house. Coleman allowed Michael to stay overnight with his

---

[1] This is not the first suit filed by Sawyer. She dismissed a prior action, filed in Fulton County, on the same day that the trial court issued an order granting summary judgment for defendants. Because the court did not use time stamps, the trial court granted Sawyer's dismissal and set aside its summary judgment order.

mother and to report to her office the following morning.

Michael's grandmother brought him to Coleman's office the next morning. Coleman told Michael at that point that he would have to go back to the RYDC temporarily until another group home could be found. Michael was extremely reluctant to go back to the RYDC, so he and Coleman discussed the situation. At one point, Michael remarked to Coleman that he had thought about suicide but stated that he did not really want to die. He told Coleman he had tried swallowing aspirin a month or two earlier, but he had not really wanted to kill himself. Eventually, however, he agreed to let Coleman drive him to the RYDC.

After they got in Coleman's truck, Michael said he could not go back to detention. He then got out of the truck and started to walk away. Coleman talked to Michael for a minute before he took off running. Coleman pursued him. At one point, she "tackled" him, but he pushed away from her and kept running. Coleman caught up with Michael again and tried to talk to him. But as she approached, Michael scaled a barbed-wire-topped chain link fence at the mill where his mother worked. Coleman followed Michael over the fence and into the mill where she caught up with him on a fire escape. Michael asked one of the mill employees to get his mother, but Coleman directed the man not to because she was concerned that another interruption could adversely affect the mother's job. While Coleman was talking to Michael, the boy climbed over the railing and jumped to his death. Coleman testified that, even after their conversation that morning, she did not believe the boy was suicidal until she saw his demeanor change minutes before he jumped.

Sawyer's complaint alleges Coleman and Laskey violated Michael's constitutional rights under the First, Fourth, Sixth, Eighth, Ninth and Fourteenth Amendments, and she has asserted claims pursuant to 42 USC § 1983. In response, Coleman and Laskey raised the defense of qualified immunity.

Government officials are protected by the defense of qualified immunity for their discretionary actions in all but exceptional cases:

> Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U. S. 800, 818 [(102 SC 2727, 73 LE2d 396)] (1982).

*Lassiter v. Alabama A & M Univ. &c.*, 28 F3d 1146, 1149 (11th Cir. 1994). The burden is on the government official to demonstrate that

the alleged constitutional violations occurred while she was acting in the scope of her discretionary authority. Once that is established, the burden then shifts to the plaintiff to establish that the defendant violated a clearly established statutory or constitutional right. *Harbert Intl. v. James*, 157 F3d 1271, 1281 (11th Cir. 1998). This requirement that plaintiff show a clearly established right is a strenuous one:

> For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law.

(Citations and punctuation omitted.) *Jenkins v. Talladega City Bd. of Ed.*, 115 F3d 821, 823 (11th Cir. 1997). As the U. S. Supreme Court has stated, the shield of qualified immunity extends to all government actors but the plainly incompetent or those who knowingly violate the law. *Malley v. Briggs*, 475 U. S. 335, 341-343 (106 SC 1092, 89 LE2d 271) (1986).

Here, the allegations center around Coleman's actions in supervising Michael. Sawyer has not alleged that Laskey had any direct involvement in the events at issue. We have previously held that a probation officer is exercising discretionary authority in supervising or monitoring probationers in his charge. *Dept. of Corrections v. Lamaine*, 233 Ga. App. 271, 273 (502 SE2d 766) (1998) (probation officer's supervision of convicted criminal). Therefore, Coleman and Laskey are entitled to qualified immunity unless Sawyer can demonstrate that their conduct violated "a clear, factually-defined, well-recognized right of which a reasonable [juvenile probation officer] should have known." (Citation and punctuation omitted.) *Thomas v. Holt*, 221 Ga. App. 345, 348 (1) (471 SE2d 300) (1996).

1. Sawyer argues Michael's constitutional rights were violated when Coleman made the decision to transport him to the RYDC without a hearing. The U. S. Supreme Court has held that no liberty interest protected by the due process clause is affected when a convicted adult prisoner is transferred from one prison facility to another. *Meachum v. Fano*, 427 U. S. 215, 224 (96 SC 2532, 49 LE2d 451) (1976). And "[t]his general legal principle appears equally applicable to duly adjudicated juvenile delinquents in the custodial care of [the Department of Children & Youth Services in Georgia]." *People v. Bertholf*, 99 Misc.2d 321, 323 (416 NYS2d 173) (1979) (holding no constitutional violation in transferring juvenile to more secure facility, but finding transfer violated state statute that required a hearing). See also *Cruz v. Collazo*, 450 FSupp. 235, 239 (D. P.R. 1978).

Here, Sawyer does not contest that in October 1993 a juvenile court order placed Michael into the custody of the DCYS or that he was originally assigned to the RYDC while he was being evaluated for a Wilderness program.[2] Under OCGA § 49-4A-8 (e) (2), once a juvenile is committed to the DCYS, the department may "[o]rder the child's confinement under such conditions as the department may believe best designed to serve the child's welfare and as may be in the best interest of the public." In addition, the department may order "reconfinement or renewed release as often as conditions indicate to be desirable." OCGA § 49-4A-8 (e) (3). After Michael ran away from the group home, Coleman decided to house him temporarily at the RYDC until she could find another placement. She completed a Request for Apprehension form seeking approval for his transfer to the Lawrenceville RYDC. And in a phone conversation with Coleman, Micki Smith, a district director for the DCYS, approved the request. Under these circumstances, we find that Coleman had the authority to place Michael in the RYDC on a temporary basis and that no constitutional violation occurred.

2. Sawyer also contends Coleman violated OCGA § 49-4A-8 (i) (1) when she personally pursued Michael after he ran away. That section provides that a juvenile who has escaped from the department's custody may be taken into custody without a warrant by "a sheriff, deputy sheriff, constable, police officer, probation officer, parole officer, or any other officer of this state authorized to serve criminal process." OCGA § 49-4A-8 (i) (1). Sawyer contends that under this language, an officer must be authorized to serve criminal process before she is allowed to take a juvenile into custody. It is uncontested that Coleman was not so authorized.[3]

Pretermitting the issue of whether Coleman had the authority to apprehend Michael once he escaped from custody, the evidence demonstrates that Coleman believed that Michael remained under her custody and supervision, even after he ran. She testified that she did not feel that he had left her custody, stating that he was in "arm's distance" and was not out of her sight "for very long at all." She con-

---

[2] Although Sawyer states that there is nothing in the record to indicate that the juvenile court proceedings met with the requirements of due process, she bears the burden of showing that a constitutional violation occurred. In order to go behind the juvenile court's order, she must present evidence that the proper procedures were not followed. In the absence of any transcript or other record of the juvenile court proceedings, we must presume that the juvenile court's conduct of the hearing was proper and that the findings were supported by the evidence. See Adams v. State, 234 Ga. App. 696, 697 (2) (507 SE2d 538) (1998).

[3] Sawyer also contends that Coleman's decision to pursue Michael violated department procedures. In this case, Sawyer asserts violations of her son's rights under the U. S. Constitution. Even if Coleman violated an internal policy, such a breach does not demonstrate a violation of "a clear, factually-defined, well-recognized right" so as to remove Coleman from the protections of qualified immunity. See Sellers v. Baer, 28 F3d 895, 902 (8th Cir. 1994).

tinued talking to him, trying to persuade him to come back with her. Thus, her actions in chasing Michael were within her discretionary powers of supervision. See *Williams v. Solomon*, 242 Ga. App. 807, 809 (1) (531 SE2d 734) (2000) (officer's decision to pursue subject discretionary). And, there is no evidence that Coleman "knowingly violated" OCGA § 49-4A-8. Therefore, Sawyer has failed to prove that Coleman's actions in seeking to retain custody of Michael violated any clear statutory or constitutional right.

3. Sawyer next argues that qualified immunity does not apply because Coleman used excessive force in violation of Michael's substantive due process and Fourth Amendment rights. She asserts the excessive force consisted of Coleman's "seizing, tackling, scuffling and chasing" Michael.

In determining whether Coleman violated Michael's constitutional rights and thus whether Coleman is entitled to qualified immunity, we must examine her actions in light of the Fourth Amendment's objective reasonableness test, "rather than under a substantive due process approach." (Punctuation omitted.) *Graham v. Connor*, 490 U. S. 386, 395 (109 SC 1865, 104 LE2d 443) (1989); *Gardner v. Rogers*, 224 Ga. App. 165, 167-168 (1) (480 SE2d 217) (1996). "Under that test, the question is whether an officer's actions are objectively reasonable in light of the facts and circumstances confronting the officer, without regard to any underlying intent or motivation on the officer's part." (Citation and punctuation omitted.) Id. at 168 (1). And the test must be applied "from the perspective of a reasonable officer on the scene," without the application of hindsight:

> Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.

(Citation and punctuation omitted.) *Graham v. Connor*, 490 U. S. at 396-397.

Here, the only evidence of force was Coleman's statement that in her pursuit of Michael, she "scuffled" with him, which she later described as "tackling" him. He pushed away from her and continued running. There is no other evidence that Coleman used any other force in seeking to stop Michael. Nor is there evidence that the force exerted caused any injury, as Michael was able to later scale a barbed-wire-topped fence and climb to a second-story fire escape. Under the circumstances of this case, there is no evidence that Cole-

man used any force other than that reasonably necessary for Coleman to retain custody of Michael, and Sawyer's excessive force claim fails. See *Merideth v. Grogan*, 812 FSupp. 1223, 1229 (N.D. Ga. 1992).

4. Sawyer also asserts a Section 1983 claim for wrongful deprivation of life. She argues that Coleman's actions violated the Eighth and Fourteenth Amendments in that Coleman showed deliberate indifference to what she claims were Michael's suicidal tendencies.

Deliberate indifference in the context of a custodial suicide requires a determination of whether the defendant was "deliberately indifferent to an individual's mental condition and the likely consequences of that condition." (Citation omitted.) *Tittle v. Jefferson County Comm.*, 10 F3d 1535, 1539 (11th Cir. 1994). And the Eleventh Circuit has held that no Section 1983 liability exists for the suicide of an individual "who never had threatened or attempted suicide and who had never been considered a suicide risk." (Citation and punctuation omitted.) Id. at 1540. Therefore, deliberate indifference cannot be shown where the defendant had no knowledge of a detainee's suicidal tendencies. Moreover, "deliberate indifference can only be established where a plaintiff demonstrates a ' "strong likelihood, rather than a mere possibility" ' that suicide would result from a defendant's actions or inactions." Id., quoting *Edwards v. Gilbert*, 867 F2d 1271, 1276 (11th Cir. 1989).

At the time Michael was committed to the custody of the DCYS, he was evaluated by a psychologist, and the psychologist's report gave no indication that Michael exhibited any suicidal thoughts, tendencies or behavior. Sawyer submitted an affidavit, however, stating that she had mentioned two incidents to Coleman. On one occasion, Michael wrote Sawyer a note stating that he would be dead by the time she read it. On another occasion, Michael said he would rather be dead than return to the RYDC.

On the morning of his death, Michael told Coleman for the first time that he had thought about suicide and that he had even swallowed some aspirin about a month or two earlier. But he told Coleman that he had not meant to kill himself and that he did not want to die. Coleman concluded that Michael was not a threat to himself based upon this conversation.

Coleman did not become alarmed about Michael until moments before he jumped when the tone of his voice "completely changed," his expression changed and he began asking disturbing questions. Coleman then began in earnest to persuade Michael not to jump, but was unfortunately not successful.

Based upon her own conversations with Michael and the psychologist's report, Coleman did not believe that Michael had any suicidal tendencies. And when she did become alarmed, she began trying to defuse the situation. Under these circumstances, we find no

evidence that Coleman's actions demonstrated deliberate indifference or that they violated a clearly established constitutional or statutory right. See *Heggs v. Grant*, 73 F3d 317, 321 (11th Cir. 1996).

5. Sawyer also asserts that Coleman and Laskey violated Michael's substantive due process rights by "failing to protect" him. We find that Sawyer has failed to establish that the law in this area has been developed " 'in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that "what he is doing" violates federal law.' " *Jenkins v. Talladega City Bd. of Ed.*, 115 F3d at 823. In establishing that a right is clearly established so as to overcome a claim of qualified immunity, a plaintiff must rely upon specific, supporting case law:

> General propositions have little to do with the concept of qualified immunity. If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant. When considering whether the law applicable to certain facts is clearly established, the facts of [the] cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. . . . For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what [he] is doing violates federal law *in the circumstances*.

(Citations and punctuation omitted; emphasis in original.) *Lassiter v. Alabama A & M Univ.*, 28 F3d at 1150.

We find that Sawyer has failed to carry her burden on this claim.

6. Sawyer's claims center around Coleman's actions in supervising Michael, and we have found that those actions provide no basis for a federal constitutional claim. There is no evidence that Laskey had any personal involvement with Michael. Her only knowledge of Michael's case came from regular meetings with Coleman and the other case service workers in her office. The evidence shows no involvement by Laskey in the events of February 18, 1994, either directly or in a supervisory capacity. In fact, she was working in the Newton County office that day. Another DCYS employee authorized Michael's transfer to the RYDC. In order to establish Section 1983 liability against a government official, a plaintiff must show some action on the part of that official that violated a constitutional right. See *Wilson v. Strong*, 156 F3d 1131 (11th Cir. 1998).

Accordingly, we find that the trial court correctly granted summary judgment to Coleman and Laskey.

*Judgment affirmed. Smith, P. J., and Miller, J., concur.*

DECIDED JULY 12, 2000 

*Brenda H. Trammell, J. M. Raffauf,* for appellant.
*Thurbert E. Baker, Attorney General, Harman, Owen, Saunders & Sweeney, David C. Will,* for appellees.