RENDERED:  OCTOBER 7, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0954-MR

JEFF CARPENTER                                                            APPELLANT


APPEAL FROM FRANKLIN CIRCUIT COURT
v.        HONORABLE PHILLIP J. SHEPHERD, JUDGE
ACTION NO. 19-CI-01188


KATHLEEN KENNEY, ANNA
VALENTINE, TYLER STROUGH,
BEN MITCHELL, JAMES FORD,
LOVELL LEWIS, PHILLIP
CAMPBELL, AND ALAN LONG                                                   APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  COMBS, MAZE, AND K. THOMPSON, JUDGES.

THOMPSON, K., JUDGE:  Inmate Jeff Carpenter, *pro se*, appeals from the

dismissal of his complaint against Kathleen Kenney, Anna Valentine, Tyler

Strough, Ben Mitchell, James Ford, Lovell Lewis, Phillip Campbell, and Alan

Long (collectively the prison officials), based upon claims of retaliation.  Carpenter

argues he lost his job and was transferred out of the Kentucky State Reformatory (KSR) and to the Kentucky State Penitentiary (KSP) because he stated he would file a grievance.

Carpenter is serving a fifty-seven-year sentence for multiple convictions and has a medium (level three) custody classification. Carpenter was previously incarcerated at KSR before he was transferred to the Eastern Kentucky Correctional Complex (EKCC) in 2007, and then transferred to KSR on August 2, 2013. He was originally transferred from EKCC to KSR for a safety reason based on conflicts with other incarcerated persons. From 2007 to 2019, at all relevant times Carpenter was considered to require medium custody based on having a score of 12.

While at KSR, beginning in April 2018, Carpenter was given what he considered to be a desirable job as an inmate observer (watcher), as the job paid better and offered more hours than other inmate jobs.[1] Pursuant to KSR's Policies and Procedures, KSR 13-02-08, watchers are to monitor other inmates housed in the Corrections Psychiatric Treatment Unit (CPTU) who were at risk for self-harm.

---

[1] According to Carpenter as stated in his complaint he "worked from 250 to 440 hours per month (8hr to 16hr days) and was paid .48 cents per hour to top out at .68 cents/hr mthly." In comparison, he stated that in his work as a janitor at KSP he only makes "$1.40 per day five days a week."

According to Carpenter, in August 2019, there were increased incidents of inmates in the CPTU cutting themselves, with allegations being made by prison officials that the watchers were supplying them with razor blades, but he denied having any involvement with any such scheme. Carpenter states he believes that the watchers were being accused when it was in fact the staff that were to blame for the lack of security. He explained that "inmates [housed in the CPTU] bring in up to 20 – 30 razor blades in their mouths + the . . . wand-metal detector will not detect them, then the inmates pass the razor blades on fish-n-lines, in the showers during recreation and inside books."

According to Carpenter, he overheard Lt. Strough comment that he was going to lock up any watcher that he thought was bringing in razor blades and Carpenter then "voiced his opinion and stated all they were trying to do was cover up the lack of security in proper searching of the residents in CPTU[.]" Later, he was called down by Lt. Strough and "told to keep his opinions to himself." Carpenter states he told Lt. Strough that "he would file a grievance + lawsuit before being falsely accused" and Lt. Strough responded that "if I didn't shut [up] I'd go to the dorm." Carpenter did not specify when these events took place.

According to Carpenter, thereafter on August 11, 2019:

> Appellant was detained and escorted to the Captain's office where Lt. Tyler Strough was waiting to confront him and immediately accused [A]ppellant of helping inmate Jaime Sargent to cut by giving him a razor blade,

-3-

and said he only wanted one answer; I stated it wasn't going down this way and I was going thru with a grievance, and contacting the Justice Cabinet + Commission. Lt. Strough ordered me locked up.

Appellant was taken to CPTU and chained to the wall in sh[a]ckles, cuffs, [and] leather belt for over 2 hours before the rest of the watchers as an example.

Carpenter also states that he was then placed in a CPTU cell with a feces-covered mattress before being moved to administrative segregation where he was placed on twenty-four-hour lockdown. According to Carpenter, he remained in administrative segregation until August 19, 2019, and on August 22, 2019, he received two disciplinary reports, one for smuggling in contraband and another for stolen property of a Play Station 2 (a charge that had previously been investigated and dismissed in 2014). Carpenter stated he then indicated to Sergeant Zachary Terorde that he was being retaliated against and that Lt. Strough "only wrote me up after I threatened to file a grievance."

The disciplinary report form for smuggling contraband provided that the incident as observed by Lt. Strough via camera was that Carpenter assisted in passing off a package after Officer Lowe passed by conducting a security round, specifically, "Inmate Carpenter can be seen putting an object onto Inmate Jamie Sargent['s] . . . fishing line."

The investigating officer, Sgt. Terorde reported that Carpenter stated:

I didn't attach nothing to the fishing line, I didn't assist [in] passing off the package. Jeffrey Beach . . . placed a paper towel on the floor with coffee in it, Jamie Sargent tried to fish it from between us, I (Carpenter) was on a 1 on 1 watch with inmate Hardy when the fishing line struck my foot, I (Carpenter) kicked the line away from me to the left.

Sgt. Terorde summarized his interviews with other inmates as follows:

Inmate Sargent stated that he was attempting to fish from his cell to another inmate[']s cell, Carpenter had nothing to do with what I was doing.

. . .

Inmate Hardy stated he was half asleep and out of it due to committing self-harm a couple days in a row. Inmate Hardy stated that he did not see inmate Carpenter hold or touch anything like what the report reads.

. . .

Inmate Beach stated that inmate Carpenter had nothing to do with the fishing line or the coffee that was in the paper towel. Inmate Beach stated . . . that he takes full responsibility for the actions that took place and the coffee being received by inmate Sargent.

. . .

Inmate Glasscock stated "I . . . was there, but didn't really observe anything. I talked to inmate Carpenter and then left."

Sgt. Terorde's review of the camera footage is as follows:

[A]t timestamp 17:00:06 Officer John Lowe walks past inmate Sargent['s] cell and continued with his round. At time stamp 17:00:24 inmate Sargent shoots his fishing

-5-

line from under the door towards the watchers. At time stamp 17:00:32 inmate Carpenter[']s foot was on top of the fishing line at the time of inmate Carpenter[']s foot movement. At time stamp 17:00:35 inmate Beach moves his foot and pulls the fishing line with his foot and began to hook the fishing line to the package on the ground. After inmate Beach begins to help inmate Sargent with the fishing line, inmate Carpenter has nothing else to do with the fishing line.

Sgt. Terorde referred the matter to the adjustment committee, explaining he charged Carpenter with Kentucky Department of Corrections, Policies and Procedures (CPP) 15.2(II)(B)(IV)(5) for smuggling of contraband into/out of/within institution "due to inmate Carpenter assisting to pass contraband by 'fish' line."

The disciplinary report form for stolen property indicated that when Sgt. Lyons and Off. Mayfield packed up and inventoried Carpenter's property, they confiscated property that was unauthorized, including:

> 1 PlayStation 2 gaming console and related cables –
> bottom of device sanded smooth, removing serial number
> 2 PlayStation 2 controllers – sanded
> 5 PlayStation 2 games – missing numbers/wrong inmate
> number

Sgt. Terorde indicated Carpenter stated:

> [T]hat PlayStation was in my possession when I arrived
> at this institution in 2013 from Eastern. At Eastern, the
> PlayStation was stolen from me, altered on the EKCC
> yard, then found by the staff at EKCC. After EKCC
> found the PlayStation, EKCC staff realized that the
> PlayStation did belong to me and that I have had receipts

-6-

for the PlayStation.  I have receipts in my possession that show that I have owned a PlayStation since 03/16/2007 and it[']s the same one that was confiscated during the pack up.

Sgt. Terorde charged Carpenter with CPP 15.2(II)(B)(IV)(14) stealing or possessing stolen goods under $100 "due to inmate Carpenter being in possession of a[n] altered PlayStation during a pack up."  The anticipated hearing date on both disciplinary charges was for September 9, 2019.

According to the Department of Corrections Transfer Authorization Form, on August 29, 2019, it was recommended that Carpenter be transferred to Little Sandy Correction Complex (LSCC), Lee Adjustment Center (LAC), Green River Correctional Complex (GRCC), or EKCC.  All of those destinations were approved.  Under the heading "additional destinations" Kentucky State Penitentiary was listed and also classified as approved.  The form noted that Carpenter had disciplinary actions pending.  Under comments, it stated:  "Inmate was recommend transfer to KSR for safety reason.  Inmate no longer has any conflicts that are incarcerated.  Status Code 006[.]"  Lewis, Classification/ Treatment Officer signed the form.  Then the following persons approved the form: Ford, Supervisor; Campbell, Warden/Designee; and Long, Classification Branch Manager.  The form noted that Carpenter was being transferred under the authority of Kentucky Revised Statutes (KRS) 196.070.

KSR, LSCC, LAC, GRCC, and EKCC are all medium security prisons, while KSP is the Department of Corrections' only maximum-security prison and also houses Kentucky's death row inmates. *See Kentucky State Penitentiary*, COMMONWEALTH OF KENTUCKY:  DEPARTMENT OF CORRECTIONS https://corrections.ky.gov/Facilities/AI/ksp/Pages/default.aspx/ (last visited Jun. 3, 2022, 12:40 PM).  KSP, KSR, LAC, GRCC, and EKCC are all Level 4 Security Institutions.  CPP 18.5(II)(C)(4)(b).  "All levels of custody may be housed at these [level 4 security] institutions."  CPP 18.5(II)(C)(4)(c).  While Carpenter's medium level of custody classification would make him eligible to be housed at a level three institution, CPP 18.5(II)(C)(3)(c), he was not approved to transfer to any of those.

On September 10, 2019, both disciplinary reports were apparently dismissed.  Carpenter states that "the hearing officer Dismissed both disciplinary reports for lack of any evidence to support the allegations."  However, there is no written documentation of the reason for the dismissals in the record as neither Carpenter nor the prison officials submitted these records.

On September 11, 2019, Carpenter was transferred to KSP.  On September 16, 2019, Carpenter filed a grievance pursuant to CPP 14.6 regarding "Housing Assignments" in which he stated he was retaliated against when he stated he was going to file a grievance and lawsuit by having Lt. Strough conspire

-8-

with others to file false disciplinary charges against him and once they were dismissed being transferred to KSP; he requested a transfer back and restoration to his watcher position, and that he be paid damages.

On October 8, 2019, Carpenter filed a open records request seeking: "Copy of all information relating to Classification Committee Hearing held on August 28, 2019 all – Notices – sent to inmate Carpenter . . . prior to or after hearing – and notes by James Ford – Lovell Lewis – Philly T. Campbell, Allen D. Long." On October 16, 2019, this was denied on the basis that the offender information specialist "was unable to locate any documents in your file referencing a classification hearing from 8/28/2019. The last classification hearing in your file is from 5/07/2019. The institution is not required to create a record which does not already exist."

On October 17, 2019, Carpenter received a grievance rejection notice regarding his retaliation claim for being transferred and losing his job, which stated via check marks indicating the pertinent categories, along with some handwritten notes: "The issue you are grieving is non-grievable because it is a/an: Classification Committee decision. –Transfers and Job assignments are classification decisions. Adjustment Committee decision."

On November 20, 2019, Carpenter filed a complaint with the circuit court alleging: (1) retaliation for exercising his First Amendment right to file

grievances, lawsuits, and make complaints; (2) violation of several Department of Corrections regulations and administrative policies in violation of KRS 344.280 making them liable under KRS 344.450 for their retaliatory action and a conspiracy against him for falsely charging him and transferring him; (3) violation of KRS 523.100 for making and creating false documents and reports against him causing damages and resulting in his transfer, causing extreme emotional distress; (4) negligence, causing damages, loss of higher paying job, litigation costs, and being labeled a security threat; (5) violation of KRS 522.030(1) causing damages; and (6) actions were part of a course of conduct prohibited by KRS 525.070(1)(d) making defendants liable for damages.

On February 12, 2020, the prison officials filed a motion to dismiss, arguing among other things that Carpenter could not charge them with committing crimes. The prison officials denied that a classification hearing was held on August 28, 2019, explaining that Carpenter was not being reclassified but approved for transfer, and that his classification score has not changed from August 2007 through his most recent classification in November 2019.

The prison officials also noted that Carpenter's grievance was rejected as non-grievable under the standard grievance procedure of CPP 14.6, but instead could have been appealed under CPP 18.1. They argued that his action needed to

be dismissed for failure to exhaust under KRS 454.415(1)(d) as he needed to show exhaustion under CPP 18.1(II)(M).

As to the First Amendment retaliation claim, the prison officials argued that temporal proximity was not sufficient to establish retaliation and Carpenter could not immunize himself from an adverse administrative action by prison officials by preemptively stating he was going to file grievances, lawsuits, and complain to Frankfort. The prison officials also argued that there was sufficient evidence to support the disciplinary write-ups, and Carpenter failed to prove that the exercise of his protected right was a substantial or motivating factor in their alleged retaliatory conduct, with the allegations about the transfer being conclusory and barred because he failed to exhaust his administrative remedies.

On March 26, 2020, the circuit court's order was entered granting the motion to dismiss. The circuit court determined that Carpenter did not sufficiently plead any violation of his First Amendment rights either as to his disciplinary write-ups or his transfer to KSP, as their "actions were supported by legitimate penological purposes related to promoting inmate safety." The circuit court stated there was no evidence to support a violation of KRS 344.280, and as to the alleged violations of the criminal statutes, Carpenter could not prosecute them, there was no evidence there was a falsification of a classification hearing, as the form only

related to transfer authorization, and it could not find any actionable claim for negligence.[2]

On April 2, 2020, Carpenter filed a motion for reconsideration, which was denied on May 14, 2020. Thereafter, on June 8, 2020, Carpenter filed a motion to proceed *in forma pauperis* on appeal, and simultaneously Carpenter tendered a notice of appeal, stating that he was appealing the May 14, 2020, order denying reconsideration of the March 26, 2020, order dismissing the complaint.

Carpenter's tendered notice of appeal was not filed until July 20, 2020, when the order allowing Carpenter to proceed *in forma pauperis* was granted.

On appeal, Carpenter argues solely about his first claim for retaliation. He argues his treatment after exercising his First Amendment rights by stating he would file a grievance and lawsuit shows he was retaliated against, pointing to

---

[2] On July 2, 2020, a different opinion and order was entered which also granted the motion to dismiss. This opinion and order was done by a different judge. This order dismissed the claims pursuant to KRS 523.100, KRS 522.030, and KRS 525.070 as the court did not have the power to prosecute these criminal claims, denied a violation of KRS Chapter 344 could take place where Carpenter was not considered an employee by providing prison labor, determined Carpenter failed to exhaust his administrative remedies for his transfer to KSP as that classification decision was appealable pursuant to CPP 18.1, and determined he failed to prove exhaustion as required pursuant to KRS 454.415. As to the First Amendment retaliation claim, the court determined that Carpenter did not engage in the protected activity of filing grievances until *after* he claims he was retaliated against, he has no right to be incarcerated in a particular institution with transfers being permissible where they served a legitimate penological interest, his original transfer to KSR was for safety reasons that no longer exist, and he cannot immunize himself from transfer by filing a grievance and then claiming that everything that happens after is retaliatory.

being chained to a wall, being placed in a cell with a feces-covered mattress, being placed on administrative segregation, having disciplinary action taken against him, and being transferred. He argues that the transfer to KSP was done "for no reason and without a classification hearing" and "was done for no other reason except retaliation for threatening to file a grievance + lawsuit[.]"

The prison officials argue that the circuit court correctly dismissed Carpenter's complaint of retaliation in violation of his First Amendment rights because: (1) he failed to allege any personal involvement by Mitchell, Kenney, or Valentine; (2) there was no evidence that Strough, Ford, Lewis, Campbell, and Long retaliated against him as they were motivated by valid penological purposes related to promoting inmate safety; (3) Carpenter did not plead facts which would permit a finding of retaliation; and (4) Carpenter cannot immunize himself from any disciplinary action and/or administrative action by threatening to file a grievance or lawsuit.[3]

As Carpenter's complaint was dismissed as a matter of law for failure to state a claim upon which relief can be granted, we engage in *de novo* review. *Carroll v. Meredith*, 59 S.W.3d 484, 489 (Ky.App. 2001).

---

[3] The prison officials also argue against all of the other grounds listed in Carpenter's complaint, even though Carpenter waived these arguments on appeal.

We affirm for two reasons. First, Carpenter failed to exhaust his administrative remedies as required by KRS 454.415. CPP 18.1(II)(M) provides the appeal process for "any classification action." "Classifications" in CPP parlance include a variety of actions, not just the assignment of the inmate's custody level, and include prison transfers. *See* CPP 18.1(II)(B)(9); CPP 18.1(II)(E)(7); CPP 18.1(II)(I)(2)(d); CPP 18.1(II)(K)(1)(i). Prison transfers are a conditions of confinement issue requiring exhaustion. KRS 454.415(1)(d).

The classification appeal process requires that such appeal be made within five working days of the action. CP 18.1(II)(M)(1). If dissatisfied with the Warden's or the Warden's designee's response, the inmate may request review from the Director of Population Management or designee. CPP 18.1(II)(M)(2).

While Carpenter tried to exhaust his administrative remedies, he used the wrong process. He filed pursuant to CPP 14.6 which applies to prison discipline, rather than CPP 18.1 which applies to classification decisions. Therefore, he did not exhaust his administrative remedies. We note that, although it may not have been effective, when told classification challenges could not be filed under CPP 14.6, Carpenter did not ask for his grievance to be converted into a CPP 18.1 appeal, appeal the denial of his grievance, or file an untimely CPP 18.1 appeal. So even if arguably the CPP 14.6 process might have applied to his claims regarding the loss of his prison job (even though he couched them in terms of the

-14-

consequences of a retaliatory housing assignment in that he was transferred to a different prison), his remedy was not exhausted even under this provision.

Second, Carpenter has failed to establish a causal link between the exercise of his free speech rights and the subsequent actions taken by prison officials, including his transfer to KSP, and it was therefore appropriate for his case to be dismissed for failure to state a claim. As a matter of law, his claims cannot be established. *See Greene v. White*, 584 S.W.3d 299, 304 (Ky.App. 2019).

While prisoners do not lose their constitutional rights, these rights do not allow for the same level of freedoms as exercised outside of prisons. Inmates' free speech rights are curtailed within prisons in order to serve penological interests, such as maintaining prison discipline. *See Turner v. Safley*, 482 U.S. 78, 87-90, 107 S.Ct. 2254, 2260-62, 96 L.Ed.2d 64 (1987); *Pell v. Procunier*, 417 U.S. 817, 822-23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974).

We do not discount that in appropriate cases redress is available when prisoners have suffered retaliation for the exercise of their First Amendment rights. Our Court recognizes that there is a First Amendment right to file grievances against prison officials. *Wright v. Damron*, No. 2004-CA-001918-MR, 2005 WL 1654874, at *2 (Ky.App. Jul. 15, 2005) (unpublished).[4] An inmate "does have a

---

[4] Pursuant to the Kentucky Rules of Civil Procedure (CR) 76.28(4)(c), we consider this and other unpublished appellate decisions as there are no published Kentucky opinions addressing prisoners' claims of retaliation for the exercise of their First Amendment rights.

First Amendment right to be free from retaliation once he has filed a grievance in accordance with established prison policies and procedures." *Crossland v. Kentucky Department of Corrections*, No. 2018-CA-00969-MR, 2018 WL 6721445, at *2 (Ky.App. Dec. 21, 2018) (unpublished). However, our Court also recognizes that filing such grievances is only protected conduct if the grievances are not frivolous. *Wright*, 2005 WL 1654874, at *2; *Thomas v. Motley*, No. 2004-CA-000605-MR, 2005 WL 2174616, at *6 (Ky.App. Sep. 9, 2005) (unpublished).

In *Wright*, Kentucky adopted the test for a retaliation claim set out in *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999):

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

This standard continues to be applied. *See Watkins v. Mitchell*, No. 2009-CA-002212-MR, 2010 WL 4669236 (Ky.App. Nov. 19, 2010) (unpublished).

Additionally, our Court requires that a prisoner making a claim for retaliation "allege that the 'retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline.'" *Odom v. Parker*, No. 2012-CA-001356-MR, 2013 WL 3235161, at *2 (Ky.App. Jun. 28,

-16-

2013) (unpublished) (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)).

*See Thomas*, 2005 WL 2174616, at *5 (same).

In *Thomas*, our Court recognized that the federal circuits had various approaches in how these burdens should be allocated, including a "burden shifting" approach and a "but for" approach. *Id.* at *6. The Court recognized that "[t]he question of which approach to apply to prisoner retaliation actions is one of first impression in Kentucky[,]" but did not explicitly resolve this issue. *Id.* at *7. However, it seems to have adopted the majority burden-shifting approach, as this is the test it applied to the retaliation claim at issue. *Id.* at *9.

> Under the burden shifting approach,
>
> once the inmate demonstrates that the exercise of a constitutional right was a substantial or motivating factor in the adverse action, the prison officials may still prevail by showing that they would have taken the same action absent the protected conduct for reasons reasonably related to a legitimate penological interest.

*Id.*

Carpenter cannot establish the elements for a retaliation claim from the prison discipline process he was subjected to, the loss of his prison job, or his transfer to KSP because not only did he fail to sufficiently establish these elements, but the prison officials rebutted any retaliatory motive by providing valid penological motives for the actions they took that he considers adverse. Of note, the first requirement, that he engaged in protected conduct, does not appear to be

met. Our Courts have not recognized that inmates have a free speech right to threaten to file grievances and make other complaints if things do not go their way. Inmates do not have the right to file unfounded grievances.

It appears that both times that Carpenter threatened to file grievances, based on his own description of what he said, he was seeking to dissuade prison officials from doing their job and otherwise challenging how the institution was being run in a manner that threatened prison discipline. As explained in *Thomas*, 2005 WL 2174616, at *8, there is no recognized constitutional right for an inmate to make comments warning correctional officers "not to 'pull his chain'" or "that he would 'take everybody down with me' if they could not substantiate the charges [against him]." Carpenter could not immunize future improper actions he might take by threatening to complain. However, to give Carpenter ample confidence that we have carefully reviewed his claim, we proceed to consider whether the actions the prison officials subsequently took could be considered adverse.

While Carpenter was subjected to the prison disciplinary process and temporarily placed in a CPTU cell and administrative segregation, the change in his confinement was temporary and *de minimus*, and the ultimate outcome was not adverse. *Compare with Thaddeus-X*, 175 F.3d at 383-84 (alleging retaliation by being moved to an area of the prison used to house mentally ill inmates in which

-18-

inmate was subjected to various unhealthy and unpleasant conditions and told he would remain there for a few months).

Carpenter's own recitation of the facts reveals that the prison officials were dealing with a very serious issue, that prisoners in CPTU were self-harming by obtaining razor blades, and the prison officials were investigating how these prisoners were obtaining the razor blades. Carpenter also recounted that when he was asked about this issue, Carpenter became very defensive and acted in a disrespectful manner to Lt. Strough, trying to shift potential blame onto the prison officials.

Whether or not Carpenter was correct as to who was to blame, the prison officials had a duty to investigate how contraband was getting into the CPTU and to prevent inmates from engaging in self-harm, and after seeing video of a "fishing" incident in which Carpenter was present, suspicion turned to him. Undoubtedly investigating and seeking to discipline watchers who participated in supplying prisoners with the means for self-harm, or allowed this to occur, serves the valid penological purpose of keeping prisoners safe and secure.

The prison disciplinary action that ensued against Carpenter regarding the smuggling of contraband was supported by video footage and witness testimony that supported an inference that Carpenter had either participated in the passing of contraband or been indifferent to whether it occurred but had not sought

to report it or prevent it from being passed. Similarly, the prison disciplinary action regarding stolen property was appropriately pursued after the prison officials found gaming equipment with sanded off serial numbers, as normally this would indicate wrongdoing by the inmate in possession.

It appears that the disciplinary process worked in that when these matters were considered, the charges were dismissed against Carpenter. Given this outcome, Carpenter cannot argue that the process was unfair or that the disciplinary process itself resulted in adverse consequences.

As to the loss of Carpenter's prison job, "a prisoner has no constitutional right to a specific work assignment." *Jackson v. Cain*, 864 F.2d 1235, 1247 (5th Cir. 1989). The loss of a particular prison job due to a prison transfer does not implicate a protected liberty interest. *Marksberry v. Chandler*, 126 S.W.3d 747, 751 (Ky.App. 2003).

Furthermore, there is no indication the loss of Carpenter's job was retaliatory. Having the charges dismissed did not entitle Carpenter to resume his role as a watcher. It was entirely within the discretion of prison officials to choose not to reemploy Carpenter as a watcher based on prior suspicions even if they were not enough to justify discipline. The fact that he apparently knew that "fishing" for contraband was going on in front of him, even if he denied direct involvement but never reported this to his prison supervisors, would provide a valid basis for not

-20-

returning him to this role. Additionally, while Carpenter has a subjectively less desirable job now, it is not an improper assignment designed to punish him. *Compare with Jackson*, 864 F.2d at 1247-48 (alleging retaliation by transfer from a special trusty detail job at the State Capitol to a punishment crew consisting of forty-seven days of supervised hard labor).

However, based on the timing of Carpenter's transfer, there is no need to address the issue of whether he had any entitlement to be considered for resuming his watcher role, as it would be impractical to place him back in such a role only to immediately vacate it due to his transfer.

As to Carpenter's transfer to KSP, "[i]t is well established that a prisoner has no inherent right . . . to be housed in a particular institution." *Mahoney v. Carter*, 938 S.W.2d 575, 576 (Ky. 1997). *See Meachum v. Fano*, 427 U.S. 215, 223-24, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976) (rejecting that a transfer in prison facilities was entitled to due process protections as infringing upon or implicating a liberty interest).

Our Court has recognized that while an inmate "has no constitutional right to be housed in any particular institution, prison officials cannot transfer him as ***punishment or as a deterrent*** merely for exercising his right to petition the government for redress as guaranteed by the First Amendment." *Crossland*, 2018 WL 6721445, at *3.

However, under the facts before us, Carpenter cannot establish that he was retaliated against by being transferred to another prison. Carpenter alleges that the only possible reason for him to be transferred was a retaliatory one, referencing the timeline between his threat to file grievances, the disciplinary action, and his transfer as providing proof. He also points to the fact that the classification committee did not give him a hearing before he was transferred and alleges the classification committee reused a prior form as establishing that his transfer was retaliatory and rushed through. However, as we discuss *infra*, nothing improper was done regarding his transfer and the timeline appears incidental.

A review of the power to transfer prisoners and the reasons behind such transfers will illuminate this point. KRS 197.065 provides the Commissioner of the Department of Corrections (the Commissioner) with the power to classify all prisoners and segregate them for specified reasons including "for any other purpose that the commissioner, in his discretion, may deem sufficient for the discipline of the prisoners in any institution or reformatory, and for the rehabilitation of any prisoners" and in using such power permits the Commissioner to "direct and compel the transfer of any prisoner from any penal institution or reformatory[.]" KRS 196.070(1)(e) also provides that the Commissioner has the power to transfer prisoners. *See* CPP 18.1(II)(B)(9) and (11), (E)(7), (K)(1)(i), and

CPP 18.7(II)(C)(1) (providing who is responsible for recommending and approving prisoner transfers).

Prison transfers may be made for a variety of purposes as recognized in *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538. The CPP specifies that these purposes can include the need to "[m]aximize the efficient use of resources[,]" "[r]egulate institutional populations[,]" and "[m]eet programming needs." CPP 18.7(II)(1), (2), and (5). Administrative transfers are not punitive and may be made "[t]o control population flow among institutions[.]" CPP 18.7(II)(A)(5)(c).

"In selecting an inmate to fill available bed space in Level 3 and 4 institutions, priority shall be given to an inmate of the next lower custody level who has the highest custody scores within his level." CPP 18.7(II)(K). "An inmate may be transferred to a higher security institution for administrative reasons . . . . In these cases, the inmate's custody level shall not change unless a determination is made that a higher custody level is more appropriate." CPP 18.7(II)(N)(5).

While there was a temporal connection between the prison transfer and the investigation into Carpenter's actions, there is no evidence of any kind of conspiracy to "get" him. Having reviewed the transfer form, there is no indication that the form was reused and altered. The reference to Carpenter's previous transfer to KSR is simply explaining how he came to be transferred to that facility.

Carpenter is simply mistaken that he required a reclassification hearing prior to being sent to another prison. This is not required. As explained in *Meachum*, 427 U.S. at 225, 96 S.Ct. at 2538-39, transfer hearings are not constitutionally required before prisoners can be moved to another institution. Therefore, prisoners only have whatever rights to such hearings as are granted to them by statutes or regulations.

There is no requirement in our statutes or regulations that prisoners receive a reclassification hearing before being transferred. Instead, after an initial classification, the reclassification committee meets with an inmate: (1) within ten working days of the inmate entering a new institution from a different institution to be classified, CPP 18.1(II)(J)(1)(a); (2) at least once every six months to review the inmate's classification, CPP 18.1(II)(L), and program and status, CPP 18.1(II)(K)(1)(a); and (3) for a special reclassification requested by the inmate if approved, but no more than one time per calendar year, CPP 18.1(II)(K)(3). It is only specified that an inmate has a right to receive notice of and right to attend a classification committee hearing to assign his custody level. CPP 18.1(II)(D)(5).

Inmates can be reassigned to other prisons without any need for reclassification or a classification hearing and, thus, there is no requirement that they receive notice and an opportunity to be heard prior to a transfer decision being made. While Carpenter would have a right to be heard before being reclassified, at

the time of the transfer decision Carpenter was not due for a reclassification hearing and his classification remained the same. Additionally, the decision to assign Carpenter to KSP was not made at KSR.

Based on Carpenter's existing classification, he was approved for transfer to other facilities, but apparently having room at KSP and needing to fill space there, Carpenter was assigned there. This assignment was acceptable based on his classification, whether or not it was a desirable placement for him personally. There is nothing to suggest that Carpenter was transferred due to his behavior or his exercise of his First Amendment rights. Additionally, his placement at KSP is not necessarily permanent. *See* CPP 18.7(II)(P) ("In general, an inmate shall be required to complete a six (6) to twelve (12) month placement at an institution before a transfer to another institution shall be considered.").

As the prison officials have provided a valid basis for pursuing prison discipline against Carpenter and to explain why Carpenter was transferred to KSP, appropriate processes were used and other than the timeline Carpenter has not been able to identify anything that would indicate that the prison officials' actions were in retaliation for some non-protected remarks he made threatening possible future grievances or other legal action, we are confident that dismissal was appropriate.

Accordingly, we affirm the Franklin Circuit Court's dismissal of Carpenter's complaint.

ALL CONCUR.


BRIEF FOR APPELLANT:                    BRIEF FOR APPELLEE:

Jeff Carpenter, *pro se*                      Richard D. Lilly
Eddyville, Kentucky                     Frankfort, Kentucky